FIRST TEXAS SAVINGS ASSOCIATION OF DALLAS, Appellant,

v.

DICKER CENTER, INC., et al., Appellees.

No. 1501.

Court of Appeals of Texas, Tyler.

Feb. 12, 1982.

Rehearing Denied April 15, 1982.

Walter Dunlap, Jr., Frank E. McLain, Turner, Rodgers, Sailers, Jordan & Callaway, Rod Phelan, Marvin S. Sloman, Carrington, Coleman, Sloman & Blumenthal, Dallas, for appellant.

Royal H. Brin, Strother, Davis & Hill, Linda S. Aland, Strother, Davis & Hill, L. Vance Stanton, Dallas, for appellees.

McKAY, Justice.

Suit was brought by Dicker Center, Inc., Edward T. Dicker, Dennis Dicker, Gregory T. Dicker and Jeff Dicker (Dickers) against First Texas Savings Association of Dallas (First Texas) for actual and exemplary damages for First Texas' refusal to fund a

two million dollar loan commitment. After trial before a jury, judgment was rendered for Dicker Center, Inc. and the Dickers in the sum of $962,862.50. First Texas appeals.

A loan commitment, dated July 2, 1975, was executed by First Texas and the Dickers. The loan amount was to be $2,000,000 and the purpose of the loan was to finance five one-story office buildings to be used as doctors' offices in Plano, Texas. The Dickers alleged that in accord with the loan commitment they paid First Texas $20,000 as a commitment fee and delivered to First Texas a certificate of deposit (CD) for $40,-000 as a good faith deposit; that thereafter they complied with all obligations and conditions of the commitment, and that the refusal to fund the two million dollar loan commitment was an unjustified breach of the commitment agreement. They further alleged that they demanded the return of the commitment fee and good faith deposit, that First Texas required that they sign a release and an indemnity agreement, and they signed such instruments under economic duress. They asked that the court rescind and cancel the release and the indemnity, and they prayed for damages for expenses incurred, actual damages for loss of income for 20 years in the sum of $2,000,-000, and exemplary damages of $2,000,000.

First Texas denied all material allegations, denied it had breached its commitment, alleged that the appraisal furnished by the Dickers was not satisfactory because of its amount, and pled that it relied upon the release and indemnity agreements. First Texas also filed a counterclaim for an amount equal to any judgment awarded to Dickers against First Texas plus attorneys' fees and costs.

Trial was had before a jury which found (1) that when the Dickers accepted the loan commitment they did not know that First Texas would not advance more than 75% of the appraised value of the Plano project; (2) that the Dickers complied with the terms of paragraph 24 of the loan commitment [that First Texas must be furnished with an appraisal of the property as im-

proved satisfactory to First Texas, prepared by an appraiser approved in advance by First Texas]; (3) that First Texas agreed to return to the Dickers the $20,000 commitment fee and $40,000 good faith deposit; (4) that First Texas received consideration for the return of the commitment fee and good faith deposit; (5) that the threat of McLain, an attorney for First Texas, to retain the $40,000 CD caused the Dickers to execute the release and indemnity documents; (6) that the threat of McLain was of such a character to overcome the will of the Dickers and cause them to do what they otherwise would not have done; (7) that at the time the threat to retain the $40,000 CD was made, First Texas, by and through its attorney McLain, had the power to injure the business or property of the Dickers; (8) that the threat of First Texas was imminent and the Dickers had no means of protection at the time the threat was made; (9) that the Dickers executed the release and indemnity through fear of injury to their business or property; (10) that the Dickers did not receive anything other than the $40,000 CD in return for their execution of the release and indemnity; (11) that damages suffered by the Dickers were (a) payments to sub-contractors $163,000; (b) appraisal fee $3,750; (c) commitment fee $2,862.50; (d) lost profits $500,000; and, (12) exemplary damages of $460,000.

After motion for judgment by the Dickers, and motion for judgment non obstante veredicto or alternatively motion to disregard findings, the trial court, after disregarding the $163,000 payments to sub-contractors and the $3,750 appraisal fee, rendered judgment for the Dickers for $962,-862.50.

The first seven points of First Texas address the appraisal provision in paragraph 24 of the loan commitment which reads: "The Association must be furnished with an appraisal of the property as improved, satisfactory to Association, prepared by an appraiser approved in advance by the Association." First Texas contends that the Dickers have no claim for breach of contract because they failed to meet the appraisal

requirement which was a special condition to the loan commitment. Argument is made that the Dickers did not plead nor seek a jury finding that the appraisal they furnished was satisfactory to First Texas, or that the dissatisfaction of First Texas was either unreasonable or in bad faith. First Texas asserts that there is no evidence, or insufficient evidence, that the appraisal of the property was satisfactory to First Texas, that the only material issues are whether First Texas acted unreasonably or in bad faith in its dissatisfaction with the appraisal, and that the trial court erred in denying the motion of First Texas to disregard the jury's answer to issue 2 and render judgment n.o.v. for First Texas.

The Dickers contend they pled that they "fully complied with all obligations and conditions imposed upon them by the terms of the loan commitment," that First Texas did not specifically deny such pleadings, and that under Rule 54, Tex.R.Civ.P., they are not required to prove performance. The record reveals that First Texas pled in its trial pleading "that neither Dicker Center, Inc., nor the other party Plaintiffs furnished defendant with an appraisal of the property as improved prepared by an acceptable appraiser, which was satisfactory to Association . . . ." In our view the pleading of First Texas was, in effect, a denial by it that paragraph 24 had been complied with by the Dickers, and therefore the Dickers had the burden of proving that they complied with paragraph 24.

It is the further contention of the Dickers that they introduced evidence to show compliance with the condition that an appraisal was furnished to First Texas which was satisfactory to it, and that the jury found the Dickers had complied with paragraph 24 of the loan commitment. They rely upon testimony by John Fleming, Vice President of First Texas, and Dennis Dicker. Fleming testified that he assumed the appraisal by Deterding was reasonably correct, and he issued a loan commitment for $2,000,000 pursuant to it, but that he did not recall telling the Dickers what would be a satisfactory appraisal in July, 1975. Fleming further testified he was not claiming that

the Toland McClellan appraisal was not properly done. Dennis Dicker testified that they complied with paragraph 24 by delivering to First Texas an appraisal prepared by an appraiser approved in advance by Fleming, and that it was a complete appraisal. Dicker further said neither Fleming nor anybody at First Texas ever expressed dissatisfaction to him about the Toland McClellan appraisal, to his knowledge they accepted it, and when he handed the appraisal to Fleming, Fleming said, "Thank you very much. Now that we have this, we will go ahead and complete our process that we go through and we will be getting in touch with you."

The first appraisal was $2,100,000. Dennis Dicker testified that Flemings' statement about the first appraisal "indicated to me that he wanted another appraiser, appraisal that was higher." The second appraisal by Toland McClellan was $2,285,000. It was dated February 27, 1976. Dennis Dicker further testified that Fleming said to him "this one isn't high enough either," and that First Texas was "only going to be able to loan 75% of the appraised value." The Dickers complained to First Texas that they were unaware of the 75% requirement. On March 31, 1976, Fleming wrote the Dickers that the loan commitment had expired because they had "been unable to furnish an appraisal of the property, as improved, satisfactory to this Association to justify a loan of $2,000,000."

■ The Dickers may have complied with the terms of paragraph 24 insofar as they could, but the conditional provision that such appraisal was satisfactory to First Texas was never met. In our view the Dickers' attempted compliance with paragraph 24 was not sufficient to compel First Texas to make the loan.

We agree that the actual legal issue presented by the record with reference to paragraph 24 of the loan commitment and the refusal of First Texas to fund the loan was whether such refusal was not done in good faith. *Black Lake Pipe Line Co. v. Union Construction Co., Inc.,* 538 S.W.2d 80,

88 (Tex.1976); *The B. B. Smith Co. v. Huddleston*, 545 S.W.2d 559, 562–63 (Tex.Civ. App.—San Antonio 1976, writ ref'd n.r.e.). The issues of good faith or reasonableness of the refusal were not requested nor submitted to the jury.

If it could be inferred that the jury's answer to issue 2 impliedly resulted in a finding that First Texas acted in bad faith, we find nothing in the record to support it. Appraiser Deterding, the Dickers' agent, testified that the 75% ratio was standard in the industry in the Dallas area. Fleming testified that First Texas sold its loans in the secondary market and loans in excess of a 75% ratio of loan to value are not generally saleable in that market. There is evidence that an 80% ratio is the maximum allowed by law. Eighty percent of the highest appraisal is $1,828,000; which amount is less than the $2,000,000 for which the Dickers are suing.

It is our view that First Texas adequately denied by its pleading that the Dickers had not complied with paragraph 24, and it was therefore the Dickers' burden to present proof of such compliance. We have determined that the jury's answer to issue 2 was without sufficient basis in the record that an appraisal was submitted satisfactory to First Texas. Points 2, 3, 4 and 5 are sustained.

It is undisputed that Deterding was the Dickers' agent in making the appraisal and discussing or negotiating with First Texas. Deterding testified that he knew commercial loans in the area of the property in question were being made on the basis of 75% of appraised value, and that he had told the Dickers "that they had to have a valuation of—in the area of two million six to two million seven" to satisfy appraisal requirement. The Dickers argue they are not charged with Deterding's knowledge of the 75% ratio because he may have learned of it prior to his employment by the Dickers.

In *Wellington Oil Co. of Delaware v. Maffi*, 136 Tex. 201, 150 S.W.2d 60, 63 (1941), it is stated:

The rule has been announced by this court that a principal ... is not affected by notice which comes to the agent ... unless such knowledge came to him while he was transacting the business of his principal... (citations omitted). While this court has announced that as the general rule, it has in subsequent decisions recognized an exception thereto which seems also to be recognized in practically all jurisdictions. That exception is that where the agent is the actor ..., representing his principal in the transaction to which his knowledge relates, the principal will not be permitted to avail himself of the benefits of his agent's services without being charged with his knowledge.

And in *Fireman's Fund Indemnity Co. v. Boyle General Tire Co.*, 392 S.W.2d 352, 356 (Tex.1965), in quoting the Restatement of Agency the court said:

Except for knowledge acquired confidentially, the time, place, or manner in which knowledge is acquired by a servant or other agent is immaterial in determining the liability of his principal because of it.

The contention of First Texas that it was immaterial whether the Dickers knew the standards First Texas would use in deciding whether the appraisal was satisfactory is answered by the above set out good faith test. Where a contract requires one party's performance is to be to the satisfaction of the other party "the true test of the right to disapprove is whether or not the party possessing the right has exercised good faith in the matter ...." 14 Tex.Jur.3d *Contracts* § 288 (1981). It is our view that whether the Dickers had actual knowledge First Texas would not advance more than 75% of the appraised value of the property is not an ultimate issue in this case. However, Deterding testified he told Greg and Dennis Dicker that they would be required to have a value of "two million six, two million seven" to satisfy the loan requirements.

In points 8 through 16 First Texas maintains that the Dickers released their claims against First Texas, did not establish duress, and ratified the release. On April 1,

1976, the Dickers executed a general release of First Texas expressly releasing all claims related to the loan commitment, and First Texas returned to the Dickers the $40,000 good faith CD. This suit was filed April 23, 1976.

It is undisputed that the Dickers released in writing any claim they had against First Texas for failure to fund the loan commitment. The Dickers claim they did so under economic duress because First Texas would lend only 75% of the appraisal which was a breach of contract, and that First Texas refused to rescind only in exchange for a release. It was stipulated that First Texas would not have agreed to the partial rescission—i.e., return of the $40,000 good faith deposit to the Dickers—except in exchange for the release.

Duress is generally defined as subjecting a person to a pressure which overcomes his will and coerces him to comply with demands to which he would not yield if acting as a free agent. 17 C.J.S. *Duress*, § 168 (1963).

The court in *Dale v. Simon*, 267 S.W. 467, 470 (Tex.Comm'n App. 1924, judgmt. adopted), citing *Ward v. Scarborough*, 236 S.W. 434, 437 (Tex.Comm'n App. 1922, judgmt. adopted), wrote:

> There can be no duress unless [1] there is a threat to do some act which the party threatening has no legal right to do. [2] Such threat must be of such character as to destroy the free agency of the party to whom it is directed. It must overcome his will and cause him to do that which he would not otherwise do, and which he was not legally bound to do. [3] The restraint caused by such threat must be imminent. [4] It must be such that the person to whom it is directed has no present means of protection. (Citations omitted.) [5] Where a demand made is wrongful or unlawful, and it is necessary for the party making such demand to resort to the courts to enforce same, there is no duress.... [6] But where the party making such demand has, or is supposed to have, the power to injure the business or property interests of the one

upon whom such demand is made, without resort to the courts to enforce the demand, and threatens to do an act which would cause such injury, and which he has no right to do, and thereby induces a compliance with his demand, [7] against the will of such party through fear of injury to his business or property interests, such threats amount to duress, [8] if it appears that the party making such demand and threat ought not in good conscience to retain the benefit received by reason thereof.

See *Lawrence v. J. M. Huber Corporation*, 347 S.W.2d 5, 6 (Tex.Civ.App.—Waco 1961, no writ); *Sanders v. Republic National Bank of Dallas*, 389 S.W.2d 551, 554–55 (Tex.Civ.App.—Tyler 1965, no writ).

The $40,000 CD was supplied by Edward T. Dicker who testified that he told McLain in the presence of his secretary, bookkeeper, wife, three sons and his brother that he was accepting the $40,000 certificate of deposit "only because I am under duress, I needed funds." He said then McLain gave him the document, he signed it, and then he got the certificate of deposit.

In further testimony Edward T. Dicker said he needed the money because of a "money short market," that banks were taking back real estate for loans, that all his real estate was raw land which had no income, that he had taxes to pay on it, that he owed banks, that he was on a bond and he had to pay $180,000 on it, that he was land poor, owed various debts, and the prime rate was 14%. He further said in the first of 1976 he had a net worth of $8,100,000 comprised of raw land which could not be sold at that time because the money market was poor, that he owed Republic Bank $436,000, and he sought return of the $40,000 CD and the $20,000 because he needed the funds for his operation, to pay taxes and bills, and because First Texas' failure to fund the loan commitment put him in a terrible bind. He said in March and April, 1976, he owed Republic Bank $180,000; a bonding company $108,000; taxes in Cameron County $30,000; Val Verde County $15,000; Hidalgo County

$25,000; accountants and attorneys $65,000; had annual overhead of $75,000; and, had a personal guaranty on a Percy Wilson loan. He said if he had not received the $40,000 he would have had to sacrifice something, taken a loss, or one of his properties could have been taken away.

Edward Dicker further said that on October 15, 1974, his net worth was $8,323,326, with liabilities of $151,000; that in July, 1975, his net worth was $8,341,000 with cash on hand $79,295; that on April 1, 1976, date of the release, his net worth was $7,381,000 with $79,198 cash. In further testimony he said as of April 1, 1976, he owned the following property valued as listed:

| | |
|---|---:|
| 110 acres Cameron Industrial Park, Cameron County | $ 550,000 |
| 200 lots Hidalgo Park Estates Development | 300,000 |
| 950 lots Cameron Park Development, Brownsville | 3,325,000 |
| 1200 lots Val Verde Park Development | 1,800,000 |
| 10 acres beach front property, Galveston | 400,000 |
| 2000 acres Pine County, Minnesota | 400,000 |
| Office building, 2600 Fairmount, Dallas | 110,000 |
| Ledbetter School building, Gentry St., Dallas | 150,000 |

He said he owed Republic Bank $140,000 and that was one of the reasons he needed the $40,000.

The record reveals that instead of using the $40,000 to pay on his debts or obligations Edward Dicker deposited it in his savings account in Republic Bank. Edward Dicker's alleged pressing need for the $40,-000 is not supported by the record which showed he had adequate assets and borrowing power greatly exceeding $40,000. We find that all the elements of economic duress have not been established. The record does not support a finding that the free agency of Edward Dicker was destroyed, or that his will was overcome, that First Texas had the power to injure his business or property, that Edward Dicker had no present means of protection, or that the Dickers executed the release through fear of injury to their business or property.

The fact that Edward Dicker announced that he was signing the release under duress does not establish that conclusion without proof of the elements of duress. The record is absent any evidence that Edward Dicker (or other Dicker) was without the means or ability to employ legal counsel to attempt to recover the $40,000 CD and neither does the record reflect whether Edward Dicker had contact with legal counsel prior to the time he said he was signing under duress. It is said in *Tower Contract Co., Inc. of Texas v. Burden Bros., Inc.*, 482 S.W.2d 330, 335 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.):

> [O]ur courts of Texas have consistently followed the rule, as a matter of law, that (1) there can be no duress unless there is a threat to do some act which the party threatening has no legal right to do; (2) there must be some illegal exaction or some fraud or deception; (3) the restraint must be imminent and such as to destroy free agency without present means of protection. (Citing cases.)

The loan commitment provided "The 2% Good Faith Deposit will be held without interest and refunded to the borrower upon disbursement of the loan as provided in this commitment. In the event the loan is not disbursed, this association shall be entitled to retain said amount as compensation for services rendered." It appears that First Texas had a legal right to retain the 2% good faith deposit; therefore, the threat to retain it was not an act which First Texas had no right to do. The courts were available to the Dickers to compel the return of the $40,000 CD if they were entitled to it. *See Silliman v. United States*, 11 Otto 465, 471, 101 U.S. 465, 471, 25 L.Ed. 987 (1880).

■ There is no contention that First Texas was responsible for Edward Dicker's financial condition or situation at the time First Texas proposed to return the $40,000 CD in exchange for a release by the Dickers of any and all claims against First Texas for failure to fund the loan. It seems to be a settled principle of law that economic duress may be claimed only when the party against whom it is claimed was responsible

for claimant's financial distress. In 17 C.J.S. *Contracts*, § 177 (1963), it is said: "A charge of economic duress or business compulsion *must be based on the acts or conduct of the opposite party and not merely on the necessities of the purported victim, or on his fear of what a third person might do*, and the mere fact that a person enters into a contract with reluctance, or as a result of the pressure of business circumstances, financial embarrassment, or economic necessity, does not, of itself, constitute business compulsion or economic duress invalidating the contract." (Emphasis added.)

■ According to the record the need for funds testified to by Edward Dicker was unrelated to his relationship to First Texas. Even if First Texas had funded the loan Edward Dicker would have continued to have the same unrelated available cash problems about which he testified. Stress of business conditions will not constitute duress unless the defendant was responsible for that condition. *Fruhauf Southwest Garment Co. v. United States*, 111 F.Supp. 945, 951 (Ct.Cl.1953); *Lawrence v. Muter Co.*, 171 F.2d 380, 382 (7th Cir. 1948); *W. R. Grimshaw Co. v. Nevil C. Withrow Co.*, 248 F.2d 896, 904 (8th Cir. 1957).

■ First Texas maintains that as a matter of law the release bars the Dickers' claims, and the judgment does not cancel the release or require its rescission. First Texas also contends that as a matter of law Dickers have ratified the release by accepting its benefits. We agree with these contentions.

The release of April 1, 1976, signed by the Dickers relinquished the claims the Dickers then made and are asserting in this case. The judgment of the trial court does not rescind or void the release of First Texas by the Dickers, nor does it require the Dickers to return the $40,000 CD or the release of the Dickers by First Texas. They orally tendered the $40,000 during trial but the judgment did not give credit for it. They have elected to retain the benefits. Even if the release by the Dickers to First Texas was executed under duress it was not void

but merely voidable at the instance of the Dickers, and it has legal effect until judicially set aside. *Country Cupboard, Inc. v. The Texstar Corp.*, 570 S.W.2d 70, 74 (Tex. Civ.App.—Dallas 1978, writ ref'd n.r.e.).

Moreover,

Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate. Ratification occurs when one, induced by fraud to enter into a contract, continues to accept benefits under the contract after he becomes aware of the fraud, or if he conducts himself in such a manner as to recognize the contract as binding. Once a contract has been ratified by the defrauded party, the defrauded party waives any right to seek rescission. *Sawyer v. Pierce*, 580 S.W.2d 117, 122 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

Points of error 8, 10, 11, 15 and 16 are sustained.

■ It is contended by First Texas that judgment should have been rendered for it because the loan demanded by Dickers was illegal. Regulation 8.1C of the Rules and Regulations for Savings and Loan Associations promulgated by the Texas Savings & Loan Commission was introduced into evidence without objection. That regulation provides that a savings and loan association may make a secured loan on improved real estate "that does not exceed 80% of the appraised value." Eighty percent of the highest appraisal, $2,285,000, would be less than two million dollars.

"A contract to do a thing which cannot be performed without a violation of the law is void." *Texas Employers' Insurance Association v. Tabor*, 283 S.W. 779, 780 (Tex. Comm'n App.1926, judgmt adopted); *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 148–49 (1947). A contract made in violation of the constitution, statutes or regulations promulgated thereunder is illegal and unenforceable. *Minardus v. Zapp*, 112 S.W.2d 496, 498 (Tex.Civ.App.—Austin 1938, no writ); 14 Tex.Jur. *Contracts*, § 141 (1981). Point of error 17 is sustained.

■ First Texas asserts the Dickers cannot recover future profits as a matter of law because Dicker Center was a new business with no history of profits at the time the Dickers sold it in 1976, or even at the time of trial in 1979. The leases to doctors were made in February and March, and the property of Dicker Center was sold to Hospital Corporation of America (or one of its subsidiaries) on March 22, 1976. According to the record at the time of sale of the center, 61% or 62% of the square footage had been leased. There was 46,545 square feet in the center, and 62% of that amount is 28,857.9 square feet. It was leasing for $6.50 per square foot, and the total annual revenue from leasing was approximately $187,570.50 annually. The payments at $17,577.92 per month would be $210,935.04 per year. According to these figures the Dicker Center project would lose approximately $23,364.54 annually. If the percentage of occupancy was 61% there would be more loss. The Dickers claimed their loss of profits should be calculated by using 100% occupancy for 20 years, and Edward Dicker testified that 100% occupancy would result in annual revenues of $302,542.00 while annual payments of $211,935.04 would result in $91,607.46 annual profit. There was no mention of cost of maintenance and repair or taxes.

James Epps, a hospital administrator for Hospital Corporation of America, the purchaser of Dicker Center, testified the center had a bad reputation in the medical community, that dirt washed away from the foundation of two buildings and washed dirt inside one, that the buildings required completion on the exterior walls, that all five buildings had roof leaks and air conditioning problems, that the parking lot had to be replaced at a cost of $120,000, that the sprinkler system was non-functional throughout, that the air conditioners were in wells on the roof on all five buildings and all had to be completely redone because they leaked water into the buildings, and that approximately $200,000 was spent between July and December, 1976, on these items.

Epps further testified that Hospital Corporation of America made no profit from the medical office complex in 1976, that it had a loss in 1977 of approximately $200,-000, that it had a loss in 1978 of $150,000 to $180,000, and that it continued to sustain a loss of $86,000 through September 30th, 1979. Epps said it was his opinion that the medical office complex "can break even and that is about all." He said the center was approximately 80% occupied in January, 1979, and some doctors were still receiving free rent.

Both parties cite *Atomic Fuel Extraction Corp. v. Estate of Slick*, 386 S.W.2d 180, 189 (Tex.Civ.App.—San Antonio) *writ ref'd n.r.e. per curiam*, 403 S.W.2d 784 (Tex.1965). It is said there: "An established business should be one that is in actual operation long enough to give it permanency and recognition. It should be one that has earned a profit which can reasonably be ascertained and approximated."

In our view the Dickers cannot recover future profits. "It is not enough that profits merely be anticipated or hoped for; they must be established with reasonable certainty." *City of Austin v. Teague*, 570 S.W.2d 389, 395 (Tex.1978). *See Keener v. Sizzler Family Steak Houses*, 597 F.2d 453, 458 (5th Cir. 1979) and *Atomic Fuel Extraction Corp. v. Estate of Slick, supra*, and cases therein cited. Dicker Center was not an established business with a record of profits—the record establishes there were no profits before or after its sale; to the contrary, there were continuous losses. We hold the Dickers were not entitled to lost profits under the record presented here. First Texas' points 18 and 20 are sustained.

■ The next contention of First Texas is that the Dickers cannot recover exemplary damages because as a matter of law they are not recoverable for breach of contract, and because the Dickers did not seek either actual or exemplary damages based upon a tort. We sustain these points.

The Dickers sued First Texas for breach of contract for refusal to fund a $2,000,000 loan commitment, and pled in paragraph XII of their Second Amended Petition:

"Plaintiffs would show that Defendants' refusal to fund the Two Million Dollar ($2,000,000) loan commitment was arbitrary, capricious, and based upon a willful and malicious action by Defendant, Plaintiffs request exemplary damages in the amount of Two Million Dollars ($2,000,000)." Special Issue No. 12 read: "From a preponderance of the evidence, what sum of money, if any, if paid now in cash, do you find should be awarded as exemplary damages to plaintiff .... for the willful and malicious conduct, if any of First Texas .... in refusing to fund the $2,000,000 commitment"?

It is the long established rule in Texas that "exemplary damages cannot be recovered for a simple breach of contract, where the breach is not accompanied by a tort, even though the breach is brought about capriciously and with malice." *A.L. Carter Lumber Co. v. Saide*, 140 Tex. 523, 168 S.W.2d 629, 631 (Tex.1943). This rule has been followed by many cases among which are *K.W.S. Manufacturing Co., Inc. v. McMahon*, 565 S.W.2d 368, 372 (Tex.Civ. App.—Waco 1978, writ ref'd n.r.e.) and *Mobile County Mutual Ins. Co. v. Jewell*, 555 S.W.2d 903, 912 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.). "The requirement is simply that both a tort and breach of contract be separately pled and proved ...." *Crutcher-Rolfs-Cummings, Inc. v. Ballard*, 540 S.W.2d 380, 388 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.); *cert. denied* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). We do not find in the record a distinct tort, alleged and proved, independent of the contract, upon which punitive damages could be based. In our view the evidence does not demonstrate a malicious attitude by First Texas or its agents toward the Dickers or that First Texas acted maliciously or with willful intent to injure them. Points of error 21, 22 and 24 are sustained.

The last complaint is that the jury's answer that the services of First Texas attorneys were without monetary value was against the great weight and preponderance of the evidence. We sustain this point. The pleadings in First Texas' coun-

terclaim allege the indemnity agreement by which the Dickers agreed to hold First Texas harmless. The uncontradicted evidence presented by First Texas consisted of the hours worked, work done, average hourly charge and a reasonable fee. The jury answered issue 13 "–0–" in response to an inquiry of the reasonable value of legal services rendered to First Texas by their attorneys in defense of the suit. The jury was not at liberty to ignore the evidence. As stated in *Elizabeth-Perkins, Inc. v. Morgan Express, Inc.*, 554 S.W.2d 216, 219 (Tex. Civ.App.—Dallas 1977, no writ), "Although the jury was not bound to accept this testimony absolutely, it was not at liberty to reject it totally in finding 'none' in answer to the question concerning reasonable attorney's fees." The jury was not asked whether attorney's fees should be awarded. We find the answer to issue 13 to be so against the great weight and preponderance of the evidence as to be unjust.

We hold that the trial court erred in failing to grant the motion of First Texas for judgment notwithstanding the verdict.

The judgment of the trial court insofar as it fails to provide for a reasonable attorney's fee for counsel for First Texas is reversed and remanded to the trial court.

In all other respects the judgment is reversed and judgment is rendered that the Dickers take nothing.