Appellant=s and Appellee=s Motions for Rehearing Overruled; Affirmed in
part, Reversed and Remanded in part; Opinion Issued January 15, 2004 Withdrawn;
and Majority and Dissenting Opinions on Third Motion for Rehearing filed June
17, 2004













Appellant=s and Appellee=s
Motions for Rehearing Overruled; Affirmed in part, Reversed and Remanded in
part; Opinion Issued January 15, 2004 Withdrawn; and Majority and Dissenting
Opinions on Third Motion for Rehearing filed June 17, 2004. 

 

 

In The

 

Fourteenth Court of Appeals

_______________

 

NO. 14-01-00854-CV

_______________

 

MARGARET DYE SUDAN, now known as

MAGGIE MACKENZIE, Appellant

 

V.

 

PHILIP P. SUDAN, JR., Appellee

______________________________________________________

 

On Appeal from the 309th District Court

Harris County,
Texas

Trial Court Cause No. 93-06003A

______________________________________________________

 

M A J O R I T Y  
O P I N I O N   O N   T H I R D

M O T I O N   F
O R   R E H E A R I N G

 

Appellant=s and Appellee=s motions for rehearing are
overruled, our opinions issued in this case on January 15, 2004 are withdrawn,
and the following majority and dissenting opinions are issued in their place.








In
this case to enforce an agreement incident to divorce, Margaret Dye Sudan, now known as Maggie Mackenzie (AMackenzie@), appeals a summary judgment granted
in favor of Philip P. Sudan, Jr. (ASudan@) and the denial of her own motion
for summary judgment.  We affirm in part
and reverse and remand in part.

Background

In
1993, the parties entered into an agreement incident to their divorce (the Aagreement@) that was incorporated into their
divorce decree (the Adecree@).[1]  In 1998, the parties entered into an
amendment to the agreement (the Aamendment@). 
Sudan thereafter made no further payments to Mackenzie under the
agreement.[2]  In 1999, Mackenzie sued Sudan for rescission
of the amendment, breach of the agreement, intentional infliction of emotional
distress, and tortious interference. 
After the parties filed cross motions for summary judgment, the trial
court granted Sudan a partial summary judgment, denied Mackenzie=s motion, and severed the remaining
claims.[3]

Standard of Review

A
traditional summary judgment may be granted if the motion and summary judgment
evidence show that there is no genuine issue of material fact and the moving
party is entitled to judgment as a matter of law on the issues expressly set
out in the motion or response.  Tex. R. Civ. P. 166a(c).  In reviewing a traditional motion for summary
judgment, we take all evidence favorable to the nonmovant as true and resolve
every doubt, and indulge every reasonable inference, in the nonmovant=s favor.  Tex. Commerce Bank, N.A. v. Grizzle, 96 S.W.3d
240, 252 (Tex. 2002).








A
no-evidence motion for summary judgment must be granted if: (1) the moving
party asserts that there is no evidence of one or more specified elements of a
claim or defense on which the adverse party would have the burden of proof at
trial; and (2) the respondent produces no summary judgment evidence raising a
genuine issue of material fact on those elements.  See Tex.
R. Civ. P. 166a(i).  In reviewing
a no-evidence summary judgment, we review the evidence in the light most
favorable to the nonmovant, disregarding all contrary evidence and inferences,
to determine whether more than a scintilla of probative evidence was presented
on the challenged elements of the nonmovant=s claim.  See King Ranch, Inc. v. Chapman, 118
S.W.3d 742, 751 (2003).  Where summary
judgment has been requested by both sides, granted to one, and denied to the
other, we determine all questions presented and, if the judgment is in error,
render that which the trial court should have rendered.  Dow Chem. Co. v. Bright, 89 S.W.3d 602,
605 (Tex. 2002).

Validity of Amendment

In
seeking summary judgment against Mackenzie=s claims for breach of his
obligations under the agreement and decree, Sudan relied principally on the
amendment to support his defenses of modification, ratification, release,
accord and satisfaction, payment, waiver, estoppel, and novation.  Mackenzie challenged the validity of the
amendment on the three grounds discussed below.

Lack of Court Approval

Mackenzie=s first and fourth issues challenge
the granting of Sudan=s motion for summary judgment to the extent it was based on
the amendment.  Among other things, she
contends that, because the amendment concerned child support and/or implicated
a child=s best interest, it could not be
effective to modify the agreement and decree without court approval.[4]








In
Texas, the Legislature has explicitly required that parental agreements
concerning child support be expressly approved by the court based on whether
the agreement is in the child=s best interest.[5]  Accordingly, agreements by parents to reduce
or modify court-ordered child support obligations without such approval violate
public policy and are unenforceable.[6]

However,
Mackenzie=s claims for child support are not
before us in this appeal,[7]
and her brief cites no authority providing that the amendment could not validly
modify obligations under the agreement and decree other than for child support
without court approval.  Accordingly, her
challenges to the amendment based on lack of court approval afford no basis for
relief with regard to the claims at issue in this appeal[8]
and are overruled.

Adequacy of Consideration

Mackenzie
contends that the amendment was unenforceable for lack of, or inadequate,
consideration because Mackenzie received only $30,000 that Sudan already owed
her under the agreement while relinquishing over $500,000 in future payments
and the value of their home, approximately $900,000.








A
contract that lacks consideration is unenforceable.  Fed. Sign v. Tex. S. Univ., 951 S.W.2d
401, 409 (Tex. 1997).  What constitutes
consideration for a contract is a question of law.  Brownwood Ross Co. v. Maverick County,
936 S.W.2d 42, 45 (Tex. App.CSan Antonio 1996, writ denied).  Consideration can be either a benefit to the
promisor or a loss or detriment to the promisee, including surrendering a legal
right.  N. Natural Gas Co. v. Conoco,
Inc., 986 S.W.2d 603, 607 (Tex. 1998). 
Payment by a debtor before payment is due of an amount less than would
ultimately have been required is sufficient consideration to support the
creditor=s agreement to accept the payment in
full satisfaction of the total amount due. 
Neeley v. Southwestern Inv. Co., 430 S.W.2d 465, 468 (Tex.
1968).  In that the $30,000 Mackenzie received
for entering into the amendment was paid and accepted before that amount was
due, we have no basis to conclude that the amendment was without consideration.

With
regard to the adequacy of that consideration, the requirement of consideration
is not a safeguard against improvident contracts.  Restatement
(Second) of Contracts ' 79 cmt. c (1981). 
Therefore, if consideration is found, there is no additional requirement
of equivalence of values exchanged, and courts will not ordinarily  inquire into the adequacy of
consideration.  Id. ' 79(b) and cmt. c.  However, gross inadequacy of consideration
may be relevant to other issues, such as duress.  Id. ' 79 cmts. c, e; see City of
Lubbock v. Phillips Petroleum Co., 41 S.W.3d 149, 161 (Tex. App.CAmarillo 2000, no pet.).  Therefore, we overrule Mackenzie=s challenge to the existence of
consideration, and we review her challenge to the adequacy of the consideration
in the context of her duress contention, discussed in the following section.

Economic Duress








Mackenzie
contends that the amendment is also unenforceable because she signed it under
economic duress caused by Sudan.  Duress
exists where: (1) there is a threat to do an act that the threatening party has
no legal right to do; (2) the threat is of such a character as to destroy the
free agency of the person to whom it is directed, causing him to do what he was
not legally bound to do and would not otherwise do; (3) the restraint caused by
the threat is imminent; and (4) the party against whom it is directed has no
present means of protection.[9]  Where an alternative may take the form of a
legal remedy, a threat to breach a contract does not constitute duress unless
there is evidence of some probable consequences therefrom for which the legal
remedy afforded by the courts is inadequate. 
Hartsville Oil Mill v. United States, 271 U.S. 43, 49 (1926); Restatement (Second) of Contracts ' 175 cmt. b (1981).  The test for causation, i.e., whether
the duress contributes substantially to the claimant=s decision to assent, is subjective,
considering all surrounding circumstances, such as the background and
relationship of the parties and the emotional condition of the party claiming
duress.  See Restatement (Second) of Contracts ' 175 cmt. c.








In
this case, Sudan=s motion for summary judgment asserted both that there was no
evidence of each element of Mackenzie=s duress claim and that the claim was
defeated as a matter of law by evidence that, at the time the alleged duress
took place: (1) Sudan had paid Mackenzie more than $1 million dollars and was
current on all prior alimony payments; (2) Mackenzie=s CPA was the one who suggested the
$30,000 lump sum payment; (3) Mackenzie was working at a law firm and received
assistance from that firm in finalizing the amendment; (4) Mackenzie had legal
remedies to prevent Sudan from acting wrongfully; and (5) Mackenzie had access
to competent legal counsel in Texas whom she subsequently hired to represent
her in this case on a contingency basis.

Mackenzie=s affidavit contained the following statements
relevant to the duress issue:

 

[During
the divorce, Sudan] also told me that if I insisted on an investigation of  [his law] firm=s assets he would quit his job and go
to work at the 7-11 and that I wouldn=t get any money at all.

 

During the negotiations to divide the community
estate, Phil refused to provide information to me related to our community
estate.  Thus, instead of receiving my
equitable division of [it], I took a payout over more than 15 years.  To benefit Phil=s tax
situation, the money was characterized as contractual alimony, . . . .  I paid significant taxes on [it].

 

**        *          *          *

 

[Daughter] Carly
attended a therapeutic school . . . in Colorado.  Phil 
and [subsequent wife] Tracy found a school in Connecticut and decided
they wanted Carly to go to school there. 
Carly and I went to Connecticut . . . . 
Phil called me in Connecticut and told me that if I didn=t sign an agreement that said I would pay 50% of Carly=s expenses (after what his health insurance paid),
that she would have to leave Connecticut and that our trip would be a waste of
time, even though the divorce decree said he had to pay 100% of expenses after
insurance.

 

*          *          *          *

 

Phil never paid for
Carly and [son] Robin=s transportation when they visited me.  If he bought an airline ticket for Carly and
I was to see her, he required that I pay him money or he would not let us see
each other.  On another occasion, Phil
arbitrarily and without my permission deducted $1,500.00 from my payments to
pay for a consultant that he hired and with whom I was never able to meet.  Phil would arbitrarily deduct money he
thought I owed him from my monthly payments. 
I was powerless to stop him.

 








In June 1998, Phil
only paid me $11,000, not the $12,000 I was due under the Agreement.  There were no payments, other than the
$30,000 made in July 1998.  Phil would
violate the Divorce Decree and make me pay half of Carly=s therapeutic school or he would not agree for her to
attend.  Carly needed the help and so,
even though I was not required to do so by the Decree, I could not fight Phil
and he deducted whatever he wanted, whether I agreed or not.

 

In July, 1998, five
months after he married Tracy, Phil called at [sic] me at work.  I was employed as a secretary for a law firm
in Boulder, Colorado. [H]e said . . . that he had decided he wasn=t going to honor our contractual alimony agreement any
longer because he didn=t want to . . . . 
I was devastated, couldn=t breath and told him that I had debts, expenses, a
house payment, . . . income taxes . . . and how would I be able to afford to
have Carly come home or to go see her and see Robin.  He said he really didn=t care about my situation and that he was through with
me.  I begged him to not make me lose my
home and he said he didn=t care if I didn=t have a
home.  He reminded me that if I was going
to fight him on any of this it would have to be done in the courts in Harris
County. . . .

 

I would not have agreed to the Amendment, but I had no
choice, my free will was removed by Phil Sudan=s
pronouncement. . . . 

 

I had to sell my home in Boulder, leave my job, . . .
and move back to Houston in September, 1998. 
I also had to sell the house in Houston . . . I could not live in it
myself because I could not afford it . . . .

 

I would not have
agreed to the Amendment if I had had any other choice.  Phil indicated that, if I did not sign, he
would send no more money and I would be destitute.  I needed the money to buy myself some time so
that I did not lose more money than I was going to.  I did not have an attorney.  Phil=s
actions caused me so much turmoil that I was unable to think clearly regarding
my options.

 








Taking
the foregoing evidence as true, and indulging all reasonable inferences from it
in favor of Mackenzie, this evidence is sufficient to raise fact issues as to
whether: (1) Sudan threatened to make no further payments to Mackenzie under
the agreement if she did not accept the amendment, which he had no legal right
to do;(2) the threat was of such a character as to destroy Mackenzie=s free agency (considering all
surrounding circumstances, such as the background and relationship of the
parties and Mackenzie=s emotional condition),[10]
and caused her to accept the $30,000 lump sum payment in satisfaction of all of
Sudan=s remaining obligations under the
agreement, which she was not legally bound to do and would not otherwise have
done; (3) the financial restraint from immediately losing all further payments
under the agreement was imminent; and (4) Mackenzie had no present means of
protection in being able to seek legal recourse from the courts at all or
quickly enough to prevent the financial consequences that would otherwise
result from Sudan=s threatened breach of the agreement.  Accordingly, we sustain Mackenzie=s challenge to the summary judgment
negating her duress contention.

Intentional Infliction of Emotional Distress

Mackenzie=s first issue also challenges the
summary judgment against her claim for intentional infliction of emotional
distress (Aintentional infliction@). 
Among other things, Sudan=s motion for summary judgment
asserted there was no evidence that his conduct was extreme and
outrageous.  Mackenzie=s brief contends that Sudan=s conduct was extreme and outrageous
in that he emotionally abused her and attempted to establish control over her
through the use of money and threats to interfere with her relationship with
their children.

To
prevail on her claim for intentional infliction, Mackenzie would have to prove
that: (1) Sudan acted intentionally or recklessly; (2) his conduct was extreme
and outrageous; (3) his actions caused Mackenzie emotional distress; and (4)
her emotional distress was severe.  See
Tex. Farm Bureau Mut. Ins. Co. v. Sears, 84 S.W.3d 604, 610 (Tex.
2002).  To be extreme and outrageous, a
defendant=s conduct must be so outrageous in
character, and so extreme in degree, as to go beyond all possible bounds of
decency, and to be regarded as atrocious, and utterly intolerable in a
civilized society.  Id.  Conduct that is merely insensitive or rude is
not extreme and outrageous.  Id.  Likewise, mere insults, indignities, threats,
annoyances, petty oppressions, or other trivialities do not rise to the level
of extreme and outrageous conduct.  Id.








The
court decides whether a defendant=s conduct may reasonably be regarded
as so extreme and outrageous as to permit recovery.  Id. 
In deciding whether particular conduct rises to this level, courts
consider both the conduct=s context and the parties= relationship.  Id. at 610-11.  Although a defendant=s motive or intent is relevant to an
intentional infliction of emotional distress claim, it is not enough to support
liability.  Id. at 612.  Rather, the conduct itself must be extreme
and outrageous.  Id.

In
this case, Mackenzie does not cite a case in which the type of conduct she
alleges has been found actionable for intentional infliction.  Nor does she specify any particular instance
in which Sudan=s alleged conduct can objectively be
characterized as so outrageous in character and extreme in degree as to go
beyond all possible bounds of decency, and to be regarded as atrocious, and
utterly intolerable in a civilized society. 
Under these circumstances, Mackenzie has failed to demonstrate error in
granting summary judgment against her intentional infliction claim, and her
first issue is overruled with regard to it.

Tortious Interference








Mackenzie=s first issue also challenges the
summary judgment against her claim for tortious interference with business
relations.[11]  Among other grounds pertaining to this claim,
Sudan=s motion for summary judgment
asserted that there was no evidence that he directed any conduct to any third
party with whom Mackenzie had a business relationship.[12]  Neither Mackenzie=s summary judgment response nor her
appellate brief sought to challenge this contention legally or factually.  Where, as here, summary judgment against a
claim is sought on multiple alternative grounds, an appellant=s failure to challenge each ground
asserted allows the summary judgment to be affirmed on the unchallenged
ground(s).[13]  Because Mackenzie has not challenged Sudan=s summary judgment ground asserting
no evidence of interference with any party with whom Mackenzie had a business
relationship, she has not demonstrated error in granting summary judgment
against her tortious interference claim.

Fraudulent Inducement

Sudan
moved for summary judgment against Mackenzie=s claim for fraudulent inducement of
the agreement, asserting, among other things, that there was no evidence that
Sudan made any actionable misrepresentation. 
Mackenzie challenges the summary judgment against this claim on the
ground that the following are evidence that Sudan entered into the agreement
with no intention of performing it: (1) at the time the agreement was
negotiated (leading up to the divorce), Sudan refused to disclose, or allow
Mackenzie to share in, the value of his law practice or his retirement account;
(2) in the divorce, Sudan would not let Mackenzie keep her dream house and
forced her to find another place for her and their children to live; and (3) a
few months after his re-marriage, Sudan decided the agreement was no longer
fair and unilaterally breached it.

A
promise of future performance constitutes an actionable misrepresentation if,
at the time it was made, the promisor had no intention of performing it.  See Formosa Plastics Corp. USA v. Presidio
Eng=rs and Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998).  However, the mere failure to perform a
contract is not evidence of fraud.  Id.  Rather, there must be evidence relevant to
the promisor=s intent at the time the promise was
made.  See id.








In
this case, of the three items of evidence, enumerated above, upon which
Mackenzie relies to show fraudulent inducement, the first two may arguably
support an inference of bitterness or belligerence but are not probative of
Sudan=s intent with regard to performing
the agreement.  Similarly, the third item
is evidence of only the subsequent breach and not Sudan=s intent at the time of entering into
the agreement.  In that Mackenzie has not
cited evidence of Sudan=s intent at that time not to perform the agreement, she has
not demonstrated that summary judgment was entered against her fraudulent
inducement claim in error, and her first issue is overruled.

Accordingly,
we: (1) affirm the judgment as to all issues other than Mackenzie=s challenge to the validity of the
amendment based on economic duress; and (2) reverse the portion of the summary
judgment pertaining to that issue and remand it to the trial court for further
proceedings.

 

 

/s/        Richard H. Edelman

Justice

 

Judgment rendered
and Majority and Dissenting Opinions filed June 17, 2004.

Panel consists of
Justices Hudson, Edelman, and Seymore (Seymore, J. dissenting).

 

 











[1]           At the
time of the parties= divorce, they had two minor children (the Achildren@) born
in 1981 and 1982, respectively.





[2]           This
is according to Mackenzie=s affidavit, which we take as true for summary
judgment purposes.





[3]           The
remaining claims, which are not part of this appeal, include  non-payment of child support, life insurance
premiums, and attorney=s fees.





[4]           It is
undisputed that no best interest determination or other court approval was
sought or obtained with regard to the amendment.





[5]           Williams
v. Patton, 821 S.W.2d 141, 143-44 (Tex. 1991) (citing former Family Code
Section 14.06, currently Tex. Fam. Code
Ann. ' 154.124 (Vernon 2002), and explaining at length the
policy reasons for requiring courts to expressly determine whether agreements
regarding child support are in the child=s best
interest).





[6]           State
v. Borchers, 805 S.W.2d 880, 882 (Tex. App.CSan
Antonio 1991, writ denied); Rogers v. Griffin, 774 S.W.2d 706, 707 (Tex.
App.CTexarkana 1989, no writ); Shannon v. Fowler,
693 S.W.2d 54, 57 (Tex. App.CFort Worth 1985, writ dism=d); Ex parte Payne, 598 S.W.2d 312, 317 (Tex.
Civ. App.CTexarkana 1980, orig. proceeding); Houtchens v.
Matthews, 557 S.W.2d 581, 587 (Tex. Civ. App.CFort
Worth 1977, writ dism=d); In re McLemore, 515 S.W.2d 356, 357 (Tex.
Civ. App.CDallas 1974, orig. proceeding).





[7]           See
supra, note 3.





[8]           The
issue of whether the amendment modified a child support obligation, and thereby
required court approval to validly do so, thus remains for determination in
connection with the child support claims that were severed from this case.





[9]           Dale
v. Simon, 267 S.W. 467, 470 (Tex. 1924); Restatement
(Second) of Contracts ' 175(1) (1981) (if a party=s manifestation of assent to a
contract is induced by an improper threat by the other party that leaves the
first party no reasonable alternative, the contract is voidable by that party).
Some Texas appeals court opinions list as additional elements that: (1) there
is a an illegal exaction, fraud, or deception; and (2) for a claim of economic
duress, that the party against whom it is claimed was responsible for the
claimant=s financial distress.  See, e.g., Simpson v. MBank Dallas, N.A.,
724 S.W.2d 102, 109 (Tex. App.CDallas 1987, writ ref=d n.r.e.).  However, we can find no Texas Supreme Court
opinion recognizing either of these as a separate element.  Instead, the first seems to merely be an
elaboration of the illegal threat element. 
See Ward v. Scarborough, 236 S.W. 434,  437 (Tex. 1922) (ADuress of property cannot exist
without there being a threat to do something which the threatening party has no
legal right to do B some illegal exaction or some fraud or deception.@). 
The second seems to have originated from the following passage:

It seems to be a settled principle of law that
economic duress may be claimed only when the party against whom it is claimed
was responsible for claimant=s financial distress. 
In 17 C.J.S. Contracts, ' 177 (1963), it is said: AA charge of economic duress or
business compulsion must be based on the acts or conduct of the opposite party
and not merely on the necessities of the purported victim, or on his fear of
what a third person might do, and the mere fact that a person enters into a
contract with reluctance, or as a result of the pressure of business
circumstances, financial embarrassment, or economic necessity, does not, of
itself, constitute business compulsion or economic duress invalidating the
contract.@

First Tex. Sav. Ass=n of Dallas v. Dicker Ctr. Inc., 631 S.W.2d 179, 185-86 (Tex. App.CTyler 1982, no writ). 
However, because the Texas Supreme Court has never adopted any such
requirement, and because we do not agree that it even follows from the quoted
sentence of C.J.S., we decline to treat it as a required element of the defense
of duress.





[10]          Cf.
Williams, 821 S.W.2d at 144-45 (recognizing the financial coercion that can
occur following a divorce in which a payee ex-spouse facing financial difficulties
is pressured into accepting a lower payment rather than risk the delay,
expense, and uncertainty associated with trying to collect the agreed upon
amounts).





[11]          Mackenzie
claims that Sudan interfered with her business relationships with her bank,
mortgage company, insurance company, and employer by: (1) informing her of his
intent to stop making payments under the agreement, which were necessary for
her to maintain those relationships; (2) verbally abusing her; and (3) thereby
coercing her to enter into the amendment.





[12]          See,
e.g., Holloway v. Skinner, 898 S.W.2d 793, 794-95 (Tex. 1995) (recognizing
tortious interference as a claim by a party to a contract against a third
person for wrongly inducing another contracting party to breach the contract).





[13]          See
Guzman v. Carnevale, 964 S.W.2d 311, 313 (Tex. App.CCorpus Christi 1998, no pet.); Beavers v. Goose
Creek Consol. Indep. Sch. Dist., 884 S.W.2d 932, 934 (Tex. App.CWaco 1994, writ denied); Langston v. Eagle Publ=g Co., 719
S.W.2d 612, 615 (Tex. App.CWaco 1986, writ ref=d
n.r.e.).