# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 16, 2021

Lyle W. Cayce
Clerk

No. 20-40324

LOCKWOOD INTERNATIONAL, INCORPORATED,

*Plaintiff*,

*versus*

WELLS FARGO, NATIONAL ASSOCIATION; TRUSTMARK
NATIONAL BANK,

*Defendants -Third Party Plaintiffs—Appellees*,

*versus*

MICHAEL F. LOCKWOOD,

*Third Party Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:17-CV-365

Before STEWART, COSTA, and WILLETT, *Circuit Judges*.

No. 20-40324

Gregg Costa, *Circuit Judge*:*

Two lenders seek to collect more than $58 million from Michael Lockwood. How did Lockwood find himself on the hook for that eye-popping sum? He is the sole owner of several companies that took on a $90 million revolving line of credit with Wells Fargo and Trustmark National Bank. Lockwood's personal liability arose after his companies began breaching a number of the loans' financial covenants. To avoid acceleration—through which the entire loan amount would come due at once—Lockwood himself guaranteed the companies' outstanding debt. The district court held that Lockwood breached the guaranty. We agree.

I.

Lockwood's companies—Lockwood International, Inc. and its affiliates Lockwood Enterprises, Inc., LMG Manufacturing, Inc., and Piping Components, Inc.—service the petrochemical, oil and gas, and construction industries. These businesses entered into two revolving credit notes in September 2015, borrowing $70 million from Wells Fargo and $20 million from Trustmark.

By the following year, Lockwood's companies had already breached some of their obligations. The lenders had also grown concerned about the borrowers' "cash burn," "collateral deterioration," and "poor accounting controls." To address these issues, the parties modified the loan obligations and reduced the total debt to $72 million.

The same day that the lenders and companies amended their credit agreement, Lockwood executed a personal guaranty of the debt his

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

companies had assumed. The lenders required this guaranty to ensure that Lockwood, who had "committed to fully re-engage in the business after an extended leave of absence," retained "skin in the game." At the lenders' recommendation—or insistence, as Lockwood maintains—the borrowers also brought on a chief restructuring officer (CRO) to help turn the companies around.

But the situation at Lockwood's companies did not improve. They continued to default on loan obligations. And although the borrowers had hired a CRO, Wells Fargo was unhappy that they had not granted him "full authority to operate the Borrowers" or "to right-size their businesses." The lenders therefore issued an ultimatum: give the CRO such authority within 48 hours or face possible repossession of collateral and acceleration of the loans. Rather than risk acceleration of the sizable debt he had personally guaranteed, Lockwood handed over "full authority" to the CRO. But the borrowers remained in default, missing a required $5 million loan payment.[1]

To avoid acceleration, Lockwood and the borrowers executed a forbearance agreement with the lenders that imposed financial, operational, and reporting obligations on the borrowers. In it, Lockwood acknowledged that he owed the debt set out in the amended credit agreement, that the debts were "legal, valid, and binding Obligations, enforceable in accordance with their respective terms," and that he had "no valid defense to the enforcement of such Obligations." The forbearance agreement also contained a waiver and release of all "setoffs, counterclaims, adjustments,

---

[1] Lockwood argues that the CRO, who then had full control of his companies, should have directed payment of the $5 million owed. The lenders explain in response that the money Lockwood claims was available for the periodic payment actually constituted proceeds from the fire sale of the lenders' collateral, which the lenders applied to the debt instead.

recoupments, defenses, claims, causes of action, actions or damages of any character or nature" against the lenders.

As the agreement was set to expire, and the threat of acceleration loomed once again, Lockwood and the borrowers signed another forbearance agreement recognizing their continued defaults. Lockwood once again acknowledged that he owed the listed debt, retained no defenses to payment, and waived all claims and defenses against the lenders.

When the second forbearance agreement expired and the borrowers' defaults remained uncured, the lenders finally followed through on their threats of acceleration.

Litigation immediately followed. Lockwood International sued Wells Fargo and Trustmark in Galveston federal court, seeking more than $1.5 billion in damages for negligence, fraud, conversion, and a host of other business torts. The lenders counterclaimed and impleaded Lockwood and the remaining borrowers and guarantors, alleging breach of contract and breach of guaranty. Those third-party defendants, in turn, counterclaimed against the lenders, asserting the same tort claims initially lodged by Lockwood International.

After much ado—a tangled trip through federal, state, and bankruptcy courts—nothing ultimately came of the borrowers' tort claims against the lenders. But the lenders' breach of guaranty claim against Lockwood survived, and the lenders moved for summary judgment. In response, Lockwood asserted that fact issues remained as to four of his affirmative defenses: fraudulent inducement, duress, unclean hands, and equitable estoppel.

The district court granted the lenders' motion for summary judgment. It noted that the underlying breach of guaranty was "not contested," then went on to evaluate Lockwood's defenses. The court held that the waivers

and releases Lockwood signed as part of the two forbearance agreements foreclosed any claim that he was fraudulently induced into signing the earlier guaranty. It also determined that Lockwood's allegations of intense business pressure fell short of establishing duress. Lockwood's remaining defenses failed because they related only to equitable relief no longer at issue. The district court ordered Lockwood to pay $58,710,456.26, plus interest, attorneys' fees, and costs.

## II.

To avoid enforcement of the guaranty, Lockwood needs a hat trick: He must show that the guaranty, the first forbearance agreement, and the second forbearance agreement are all voidable. Lockwood attempts to do so, arguing that in each case, the lenders obtained his signature by fraudulent means or by taking advantage of his dire financial straits.

Lockwood cannot escape his promise to guarantee the debt. Even if the guaranty itself is voidable—something we doubt but need not resolve—the first forbearance agreement ratified its terms.

Ratification occurs when "a party by its conduct recognizes a contract as valid, having knowledge of all relevant facts." *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 146 (Tex. App.—Corpus Christi 2006, pet. denied) (citations omitted). A guaranty otherwise voidable due to fraudulent inducement or duress cannot be avoided once ratified. *See Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied) (citing *Rosenbaum v. Tex. Bldg. & Mortg. Co.*, 167 S.W.2d 506, 508 (Tex. 1943)) (recognizing ratification as a defense to fraudulent inducement); *Lee v. Wal-Mart Stores, Inc.*, 943 F.2d 554, 560 n.11 (5th Cir. 1991) ("Ratification is a defense to a claim of economic duress." (citing *First Tex. Sav. Ass'n of Dall. v. Dicker Ctr., Inc.*, 631 S.W.2d 179, 186 (Tex. App.—Tyler 1982, no writ))). Ratification "may be determined as a matter of law if the evidence is

not controverted or is incontrovertible." *Barrand*, 214 S.W.3d at 146 (citation omitted).

The first forbearance agreement ratified the guaranty in no uncertain terms. It provides: "The Obligors hereby acknowledge, ratify, and confirm . . . the Guaranties . . . and all of their respective debts and obligations to Credit Parties thereunder." So unless Lockwood can invalidate the first forbearance agreement, he is bound by the ratified guaranty.

A.

In district court, Lockwood argued that the first forbearance agreement was voidable because the lenders fraudulently induced him into signing it. He contends that when he executed that agreement, "he was not yet fully aware of the full extent of [the lenders'] bait-and-switch scheme," by which they promised him control over his companies and then, guaranty in hand, stripped him of power in favor of the CRO.[2]

The district court detected a glaring problem with this theory: the timeline of events refutes it. Lockwood learned of the purported fraud—the supposed scheme to replace him with the CRO—before he ratified the guaranty. By the time Lockwood executed the first forbearance agreement, he understood that he would not be in charge of his companies' operations, as he had already relinquished "full authority" to the CRO. By ratifying his guaranty via the forbearance agreement after learning of the alleged fraud,

---

[2] It does not appear that the lenders ever represented that Lockwood would remain in charge of his companies. The lenders testified that they asked for a guaranty because they "wanted [Lockwood] tied to the business personally" and "wanted [Lockwood] to have skin in the game." But neither statement promises that Lockwood would retain full control.

Lockwood "waive[d] any right to assert the fraud as basis to avoid the agreement." *Harris*, 134 S.W.3d at 427 (citation omitted).

The fraudulent inducement defense to the first forbearance agreement fails.

## B.

On appeal, Lockwood focuses not on his temporally challenged fraud defense but instead on his defense of duress. Lockwood argues that economic duress compelled him to enter into all three agreements. For the first forbearance agreement we are discussing, he says that duress came about when the lenders improperly threatened him with loan acceleration, which would subject his companies to "financial ruin," if he did not turn over "full authority" to the CRO.

No doubt Lockwood feared the looming prospect of the banks' demanding the tens of millions of dollars that he and his companies owed. The banks used that leverage to seek something they wanted: a transfer of authority to the CRO. But using leverage is what negotiation is all about. And difficult economic circumstances do not alone give rise to duress. *See Dicker Ctr.*, 631 S.W.2d at 186. If they did, then many loans would be voidable. People and businesses often need loans because they are facing financial challenges. Borrowers who seek to modify their loan agreements after failing to make payments are even more likely to be feeling the squeeze. Opportunities to modify—and potentially stave off financial disaster—would be few and far between if a borrower could later void the modification because of the economic pressure that prompted it in the first place.

Duress requires more. *Wright v. Sydow*, 173 S.W.3d 534, 544 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) ("The victim's plight alone will not suffice; it must be coupled with the bad acts of the transgressor." (citation omitted)). It exists only when a party can prove three things: "(1) a

No. 20-40324

threat to do something a party has no legal right to do, (2) an illegal exaction or some fraud or deception, and (3) an imminent restraint that destroys the victim's free agency and leaves him without a present means of protection." *Id.* To overcome summary judgment, Lockwood must show a fact issue on each of these elements. *Id.*

Lockwood's duress defense falters at the first step because he has not proven that the lenders threatened to take any unauthorized action. *Id.*; *see Windham v. Alexander, Weston & Poehner, P.C.*, 887 S.W.2d 182, 185 (Tex. App.—Texarkana 1994, writ denied) ("Implicit in the term *duress* is that the threat is unlawful, improper, or unjust."). The compiled credit agreement permitted the lenders to accelerate the loans upon the borrowers' default.[3] In the June 2017 notice of default, the lenders communicated to Lockwood that they would consider exercising this right unless he acted within 48 hours to give full control of his companies to the CRO. Lockwood has not shown that the lenders had "no legal right" to demand he empower the CRO. *Wright*, 173 S.W.3d at 544. Nor are we aware of anything that bars a lender from seeking a change in management as a condition of a loan modification.

---

[3] Lockwood argues for the first time on appeal that because the compiled credit agreement in the summary judgment record is redlined and unsigned, a fact issue exists on whether the lenders had authority to accelerate the borrowers' debt in the manner or amount they threatened. This argument is forfeited because it was not raised in the district court. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*, 200 F.3d 307, 316–17 (5th Cir. 2000). Regardless, the compiled credit agreement setting out the debt that Lockwood guaranteed was amended several times and appears in the record as Annex A to the February 27, 2017 amendment. Because the borrowers signed the February amendment, and that amendment "plainly refers" to the compiled credit agreement attached as Annex A, it does not matter that Annex A was unsigned. *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968); *id.* ("It is uniformly held that an unsigned paper may be incorporated by reference in the paper signed by the person to be charged.").

Lockwood has not established that the lenders perpetrated any "bad acts" to obtain his signature on the first forbearance agreement. *Id.* at 544. The duress defense fails.

\* \* \*

Because Lockwood cannot invalidate the first forbearance agreement on the grounds of fraudulent inducement or duress, his ratification of the personal guaranty stands. The judgment of the district court is AFFIRMED.