Horace S. BAKER, Lucille J. Baker, Huey F. Baker and Bonnie D. Baker,

v.

COMMISSIONER OF INTERNAL REVENUE.

No. 16674.

United States Court of Appeals Fifth Circuit.

Nov. 6, 1957.

Joseph B. Brennan, William R. Patterson, Atlanta, Ga., Sutherland, Asbill & Brennan, Atlanta, Ga., of counsel, for petitioners.

Charles K. Rice, Asst. Atty. Gen., Ellis N. Slack, Atty., John N. Stull, Atty., A. F. Prescott, Atty., James P. Turner, Atty., Kenneth E. Levin, Atty., Nelson P. Rose, Chief Counsel Internal Revenue Service, John M. Morawski, Sp. Atty., Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and BORAH and CAMERON, Circuit Judges.

BORAH, Circuit Judge.

These two cases, consolidated for trial in the Tax Court and here, are before us on petitions for review of the decisions of the Tax Court. This court has jurisdiction to consider said petitions under Section 7482 of the Internal Revenue Code of 1954, 26 U.S.C. § 7482.

The sole question presented in these petitions for review is whether the Tax Court erred in holding that gain realized by taxpayers Horace S. Baker and Huey F. Baker, and their respective wives,[1] in the years 1949, 1950, and 1951, from the sale of certain war surplus electrical equipment acquired by them from a predecessor partnership was taxable as ordinary income rather than capital gain

---

1. Mrs. Lucille J. Baker and Mrs. Bonnie D. Baker were parties only because joint returns were filed by each couple during the years in question.

under Section 117(a) (1) of the Internal Revenue Code of 1939.[2]

The basic facts are not in dispute: In 1943, Huey Baker and his brother, Horace, formed a partnership, known as Savannah Armature Works, to engage in the purchase, repair, sale and installation of electrical equipment. Two years later they formed a second and separate partnership, Savannah Refrigeration Supply Company. This partnership was to deal at wholesale in air-conditioning, heating, and refrigeration appliances and parts therefor, without the performance of any installation or repair service. In both of the aforementioned partnerships Huey owned a two-thirds interest and Horace a one-third interest.

Subsequently in 1947, the Savannah Armature Works purchased a quantity of war surplus electrical equipment,[3] for the sum of $145,000, for the purpose of re-selling it to customers in the ordinary course of business. Following this acquisition the partnership proceeded to repair and sell the greater portion of such equipment and in the course of this business it conducted extensive sales activities and contacted numerous dealers through the media of "mailings" or advertising. When a prospective customer was found he would be shown the item or items in which he was interested and he either purchased them "as is", or contracted with the partnership to repair and refurbish them. In due course the sale of the war surplus equipment became the primary business of the partnership and by mid-year 1948 its repair and serv-

icing activities had dwindled to practically nothing.

By October, 1948, the greater portion of the war surplus equipment had been sold and the value of the remainder then on hand was appraised as being worth approximately $10,000. At that time, petitioners decided to close out and liquidate the Savannah Armature Works and devote their full time to the refrigeration business for the reason, among others, that certain manufacturers of refrigeration equipment had refused to supply their Savannah Refrigeration Supply Company because, contrary to the manufacturers' policies respecting wholesale jobbers, petitioners were engaged in the retail sales and service of electrical equipment. Having made this decision, petitioners endeavored to find a purchaser who would buy the entire electrical equipment partnership, including all of its assets. Failing in their efforts, they devised a plan to dispose of the business to E. B. Dawson and A. J. Roesel, who were experienced in electrical work but were not in a position to finance the venture. Accordingly, and in order to facilitate the purchase of the assets of the partnership by Dawson and Roesel, petitioners formed a corporation which was named Savannah Armature Works, Inc., and in exchange for the entire 100 shares of non-par stock, transferred to the corporation all of the partnership assets except the remaining supply of war surplus equipment. Forty-eight shares of the corporate stock were then sold to Dawson and Roesel for $30,000.[4] Of this total, $6,000 was paid in cash, $3,000 of which

2. "§ 117. Capital gains and losses. (a) Definitions. As used in this chapter— (1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; or property, used in the trade or business, of a character which is sub-

ject to the allowance for depreciation provided in section 23(*l*), * * * or real property used in the trade or business of the taxpayer; * * *" 26 U.S.C. 1952 ed., § 117.

3. This equipment consisted, among other things, of transformers, electrical switches, circuits, electrical motors, generator motors, and parts.

4. It was understood among the parties that when the forty-eight shares had been paid for, Dawson and Roesel would purchase the balance of the corporate stock.

was borrowed under the endorsement and guarantee of Huey Baker, and the balance was covered by promissory notes. Huey held the forty-eight shares owned by Dawson and Roesel as collateral on the notes given in part payment therefor, and he and Horace owned a two-thirds and a one-third interest, respectively, in the fifty-two shares which were not sold to Dawson and Roesel. The corporation took over the office formerly occupied by the partnership and the electrical business was continued without interruption. Dawson was made shop foreman, Roesel became the manager, and Huey Baker served as president and drew a salary from the corporation during the years 1949 and 1950.

At or about the time the corporation was organized, Huey Baker purchased the war surplus inventory which remained in the partnership for its appraised value of $10,000. This amount was applied to discharge the obligations of Savannah Armature Works, following which this partnership was then completely dissolved. At the time of purchase, Huey Baker thought possibly someday he would sell the equipment and did not expect to lose any money on it. However, several months, later, when it appeared from market conditions then prevailing that he might not be able to recover his investment, Huey sold a one-third interest in the stock of surplus equipment to his brother, Horace. As a consequence, the interest of petitioners in this equipment was again shared by them in the same proportions as when they were partners in Savannah Armature Works.

Thereafter, and during the years 1949, 1950, and 1951, there was a brisk market demand for the war surplus goods, and petitioners in approximately 180 separate sales disposed of most of this equipment for a total price of $62,000. During 1949 and 1950, petitioners did not advertise the equipment for sale or otherwise solicit sales, and at no time did they make new purchases or replenish their supply of such equipment. But former customers of the Savannah Arma-

ture Works partnership and others who had received its advertisement, knew that the equipment was available and many sales were made to them in the same manner as sales had been made to buyers who had purchased such items from the partnership. In addition, Dawson and Roesel called on customers and much of the equipment was sold through their efforts. When they found a prospective buyer, they would agree with Huey as to the price at which he would sell and as to what the corporation would charge for repairing and refurbishing the equipment, and if the agreed price was acceptable to the purchaser, the desired items would be turned over to the corporation for reconditioning. Upon completion of the work, the corporation would bill the buyer direct, and would then remit the sales price to petitioners after first deducting its charges for repair.

In the early part of the year 1951, after it became apparent that Dawson and Roesel would not be able to fulfill their obligations on the notes which they had given for the forty-eight shares of corporate stock, petitioners cancelled the notes, returned to Dawson and Roesel the $6,000 cash which they had paid, and the corporation was dissolved. During the period of dissolution and thereafter during 1951, petitioners made numerous sales of the surplus stock receiving therefor approximately $13,000, and in each instance these sales were billed upon the invoices and stationery of the partnership, Savannah Refrigeration Supply Company. However, the checks which they received in payment were not run through the books of the partnership, but were deposited in a special bank account and were credited two-thirds and one-third, respectively, to Huey and Horace Baker.

On their income tax returns for the years 1949, 1950, and 1951, taxpayers reported the gains realized on the sale of the war surplus electrical equipment as long-term capital gains. In 1954, the Commissioner proposed to assess against petitioners deficiencies in income taxes for these years on the grounds that their

respective distributive shares of the income from their joint venture in the sale of the surplus equipment purchased by a predecessor partnership was fully taxable ordinary income rather than capital gain as reported. Following receipt of the notices of deficiency, petitioners appealed to the Tax Court for a redetermination of the deficiencies and the two appeals were consolidated and tried before a single judge. A trial was had and at its end the Tax Court rejected petitioners' claim that the sales in question were a liquidation of property acquired and held as an investment, and sustained the Commissioner, holding that the war surplus electrical equipment sold by petitioners during the years in issue was the stock in trade of a business venture and was property held for sale to customers in the ordinary course thereof.

The facts, we think, clearly sustain the Tax Court. When the evidence which relates to the acquisition and possession of the property in question is considered in the light of the frequency and continuity of sales, the extent and substantiality of the numerous transactions, and the nature of petitioners' business and sales activity prior to October, 1948, and during the years in issue, it is plain that petitioners did not at any time depart from the business of selling electrical equipment. It matters not whether these sales appear to have been in the nature of a liquidation, because the manner of conducting the alleged liquidation was for all practical purposes identical to that used in the conduct of the partnership business, and as such constituted a trade or business. Cf. White v. Commissioner of Internal Revenue, 5 Cir., 172 F.2d 629, and Home Co. Inc. v. Commissioner of Internal Revenue, 10 Cir., 212 F.2d 637, 641. Petitioners strongly urge on us that we follow the decision of the Court of Appeals for the Eighth Circuit in Greenspon v. Commissioner, 8 Cir., 229 F.2d 947. We think that, though somewhat similar, the cases are clearly distinguishable on their facts. In Greenspon, taxpayers had been the sole stockholders of a corporation which for many years had been engaged in the business of buying, reconditioning, fabricating and selling pipe. Because of discord between the taxpayers, they dissolved the corporation and each of them received a distribution in kind of the assets of the corporation which they, as liquidating agents, sold. There was nothing in the Greenspon case, however, of the striking similarity of the activities of the taxpayers before and after the dissolution of their corporate business that are so persuasive in the instant case. The taxpayers there involved were clearly not in the same business as they had been before dissolution, for they did not renovate the pipe received in liquidation, but merely sold it as it stood after receiving it as a capital asset.

The decision of the Tax Court was right and it is affirmed.

Affirmed.