# `TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00639-CV

**National Corporate Tax Credit, Inc. VIII; National Corporate Tax Credit Fund VIII; and Henna Townhomes, Ltd., Appellants**

**v.**

**JNP Properties, Inc. and Texas Colorado Affordable Housing, Inc., Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-GN-05-002302, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellees JNP Properties, Inc. ("JNP") and Texas Colorado Affordable Housing, Inc. ("Texas Colorado") brought suit for breach of contract against appellants National Corporate Tax Credit, Inc. VIII (the "Company") and National Corporate Tax Credit Fund VIII (the "Fund") (collectively, "NCTC").[1]  By their suit, JNP and Texas Colorado sought reinstatement to the Henna Partnership, arguing that NCTC had wrongfully removed them as Operating General Partner based on their alleged breach of an agreement.  JNP and Texas Colorado asserted that the agreement had been procured under duress and was therefore invalid.  On NCTC's motion for directed verdict, the trial court found as a matter of law that JNP and Texas Colorado had breached the governing

---

[1]  The Partnership itself, Henna Townhomes, Ltd. (the "Henna Partnership"), was initially a plaintiff in JNP and Texas Colorado's suit against the Company and the Fund.  At the start of trial, the court granted Henna Townhomes's motion to realign as a defendant, and final judgment was entered against Henna Townhomes as well as NCTC.  Therefore, our collective reference to appellants as "NCTC" includes Henna Townhomes.

partnership agreements, but submitted to the jury the question of whether JNP and Texas Colorado's breach was excused based on their affirmative defense of duress. The jury found that NCTC had exerted wrongful economic coercion over JNP and Texas Colorado. In light of that finding, the trial court declared that NCTC breached the partnership agreements by removing JNP and Texas Colorado from the partnership.

On appeal, NCTC and Henna assert that the trial court's jury instruction on duress was legally incorrect; that the evidence is insufficient to support both the jury's finding on the duress question and the trial court's judgment declaring that, as a result of the duress finding, NCTC breached the partnership agreements; and that the trial court erred in awarding JNP and Texas Colorado attorney's fees. We will reverse the judgment of the trial court, render judgment in favor of NCTC and Henna, and remand the cause to the trial court for determination of the issue of attorney's fees.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 1998, the parties created a partnership for the purpose of developing a low-income housing project called Henna Townhomes using federal tax-credit awards. Pursuant to the terms of the Amended and Restated Agreement of Limited Partnership of Henna Townhomes, Inc. (the "Partnership Agreement"), JNP and Texas Colorado were the Operating General Partner, the Company was the Administrative General Partner,[2] and the Fund was the Investor and Limited

---

[2] Under the Partnership Agreement, the Company "shall withdraw as a general partner and simultaneously be readmitted as an Administrative Limited Partner" when the Henna Partnership "attains Rental Achievement."

Partner of the Henna Partnership. Under the Partnership Agreement, JNP and Texas Colorado, as Operating General Partner, had a duty to manage and control the Henna Partnership and possessed a "fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership." In addition, the Partnership Agreement provided that the Company retained the right to remove JNP and Texas Colorado as Operating General Partner in the event of any major default, and that JNP and Texas Colorado agreed to indemnify and hold harmless NCTC from and against all losses incurred in connection with a major default and NCTC's exercise of its right to remove them as Operating General Partner.[3]

Contemporaneously with the Partnership Agreement, the parties executed a number of other instruments that outlined their respective rights and obligations. We will begin by briefly summarizing the relevant agreements governing resolution of the issues in this appeal.

*Investment Agreement*

In conjunction with the Partnership Agreement, the Investment Agreement set forth the capital contribution required of each partner to fund the enterprise: $100 each from JNP, Texas Colorado, and the Company, and $7,307,311 from the Fund. As the principal investor, the Fund was required to make its capital contribution in installments based on the achievement of certain benchmarks by the Partnership. The only installment at issue in this appeal is the final payment

---

[3] Under the Partnership Agreement, a "major default" would occur if, among other things, any Operating General Partner breached any material provision of any governing agreement and that breach was not cured within ten days, or if the Partnership itself was in breach of any material provision of any project document and that breach was not cured within a reasonable period of time.

described in section 2.1(e) of the Investment Agreement, which provides that the Fund ("Investor") will contribute:

> $1,096,097 by means of Investor's promissory note payable upon the later to occur of (i) satisfaction of all conditions precedent to the payments set forth in subparagraph (d), (ii) funding of the Permanent Loan, (iii) receipt of the final allocation of the Credit Allocation as contemplated by Paragraph 2.2 . . . , and (iv) the attainment of Rental Achievement . . . .

The Investment Agreement further provided that the Fund's capital contribution "shall be subject to adjustment" as described in the Partnership Agreement. Read together, the two instruments set forth that, if the amount of housing tax credits actually allocated to the Partnership is less than initially predicted, the Fund's final capital contribution is reduced by $0.71 for every dollar reduction in credits. It is undisputed that, based on the actual housing tax credits received, the Fund's final capital contribution was reduced to $871,050.

*Development Services Agreement*

The Amended and Restated Development Services Agreement (the "Development Services Agreement"), stated that JNP and Texas Colorado, as the Operating General Partner, would pay all "development deficits."[4] Simplified, the Agreement defined "development deficits" as all funds, without limitation, in excess of the proceeds of the construction loan and the contribution of the Limited Partner that are required to complete construction of the development, effect

---

[4] More particularly, the Development Services Agreement provided that the Operating General Partner was jointly and severally liable for development deficits along with John Paul of JNP and Michael Lavery of Texas Colorado collectively as Principal.

4

Completion, and effect funding of the Permanent Loan.[5] The Development Services Agreement further provided that, as consideration for the Operating General Partner's covenant "to guaranty Completion of the Development," the Henna Partnership would pay the Operating General Partner a "Development Fee" to be earned "as of the date of Completion of the Development."[6]

*Original Operating Deficit Agreement*

The parties also executed the Operating Deficit Agreement (the "Original Operating Deficit Agreement"), which stated that JNP and Texas Colorado, as Operating General Partner, would "lend to the Partnership any amounts required to fund Operating Deficits incurred by the Partnership during the three-year period commencing with the date Rental Achievement is attained

---

[5] The definition reads, in full:

1.4 "**Development Deficit**" means all funds in excess of the proceeds of the Construction Loan, the installments of the Limited Partner Contribution described in Paragraphs 2.1(a), (b) and (c) of the Investment Agreement and, with respect only to those items described in clause (iii) below, the installment of the Limited Partner Contribution described in Paragraph 2.1(d) of the Investment Agreement, which are required to (i) complete construction of the Development (excluding that portion of the Development Fee which is deferred, subject to the provisions of Section 3.1 of the Amended Partnership Agreement), including, but not limited to, all amounts due under and pursuant to the Construction Contract, any construction cost overruns and the cost of any change orders which have been approved by the Construction Lender and which are not funded from the proceeds of the Permanent Loan; (ii) effect Completion and (iii) effect funding of the Permanent Loan, and the funding in full of any and all reserves, deposits and impounds, including, without limitation, impounds for taxes, mortgage insurance premiums and casualty and liability insurance premiums which are required to be funded prior to Construction (or which are shown in the Construction Budget as being so funded) and/or are required to be funded as a condition to the funding of the Permanent Loan.

[6] The Development Services Agreement recites that a portion of the $1,684,802 Development Fee—$311,088—was already earned by the Operating General Partner "as of December 31, 1997."

5

(the 'Funding Period')." As defined in the Partnership Agreement, "Rental Achievement" occurred after a number of conditions were fulfilled, including "funding of the Permanent Loan."

"Operating Deficits" were defined as the amounts by which the actual revenues from rental income were less than the amounts necessary to meet all operating obligations of the Partnership. Under the Original Operating Deficit Agreement, if any Operating Deficit payments were not paid by the Operating General Partner within ten days of when they were made due, "the Partnership, Investor and/or the Administrative General Partner (the 'Advancing Party'), has the right, without any obligation and without releasing the Operating General Partner, to advance any such amounts required to be paid by the Operating General Partner." Further, such advances "shall not be deemed a Voluntary Loan, but rather a loan to the Operating General Partner and, in addition to all other rights and remedies available to the Advancing Party . . . the Operating General Partner shall reimburse the Advancing Party the full amount of such funds advanced by it plus interest."

Under the subheading, "Security," section 4 of the Original Operating Deficit Agreement provided:

4.1 (a) As security for, but not a limitation of, the obligations under . . . this Agreement, Investor shall withhold $400,000 of the [final installment] portion of the Capital Contribution described in Paragraph 2.1(e) of the Investment Agreement and deposit such funds (the "Escrow Deposit") into an interest bearing reserve account with an independent escrow agent selected by the Operating General Partner and reasonably acceptable to Investor. . . .

(b) The funds in the Operating Deficit Reserve Account, together with all interest earned thereon, shall be used to pay Operating Deficits incurred during the Funding Period. The Operating General Partner shall notify Investor of any Operating Deficit and shall include with such notice reasonably detailed information about current Partnership

6

receipts and operating obligations. Provided Investor is reasonably satisfied with such information, Investor shall release to the Operating General Partner (or, at Investor's election, directly to the creditor(s) of the Partnership or jointly to the Operating General Partner and such creditor(s)) the amount of such Operating Deficit.

Construction of the Henna Townhomes commenced in the summer of 1998 and the project began leasing units the following year. At the end of the construction phase, which was funded by a $7.687 million construction loan, the Operating General Partner was obligated to secure a "Permanent Loan" that would be used to pay off the construction loan and upon which the Fund's investment was conditioned.[7] The Permanent Loan was scheduled to close on October 31, 2000, at which time the Partnership requested that the Fund release the $400,000 from the operating deficit reserve account to cover closing costs. The same day, the parties agreed to amend the Original Operating Deficit Agreement. The circumstances surrounding the release of the $400,000 Escrow Deposit to the Operating General Partner by the Fund and the amendment of the Operating Deficit Agreement form the primary dispute between the parties on appeal.

*Amended Operating Deficit Agreement*

The principal modification wrought by the Amended Operating Deficit Agreement was to extend the Funding Period—and thus the Operating General Partner's obligation to fund any

---

[7] Section 2.3 of the Investment Agreement states, "The obligation of Investor to make the Capital Contribution is further predicated on the Operating General Partner having obtained a Permanent Loan commitment (the "Permanent Loan Commitment") for the Development on or prior to the Closing . . . in the amount not to exceed $6,700,000 . . . ."

Operating Deficits—from three to five years.[8]  Further, under the Amended Operating Deficit Agreement, section 4 (formerly the "Security" provision in the Original Operating Deficit Agreement) was amended as follows:

> 4.       Operating Deficit Reserve Account
>
> 4.1     As security for, but not a limitation of, the obligations under . . . this Agreement, Investor shall withhold $290,000 of the portion of the Capital Contribution described in Paragraph 2.1(e) of the Investment Agreement and deposit such withheld funds into a debt service reserve account with and to be administered by Continental Wingate ("CW"), the permanent lender for the Apartment Complex.
>
> 4.2     All funds thereafter released by CW from the debt service reserve shall be deposited with Investor into an interest bearing account (the "Operating Deficit Reserve Account").  The funds in the Operating Deficit Reserve Account, together with all interest earned thereon, shall be used to pay Operating Deficits incurred during the Funding Period. . . .

The Amended Operating Deficit Agreement itself recited that, pursuant to the Original Operating Deficit Agreement, the Fund (as Investor) "was going to deposit a portion of the last installment of its capital contribution with an independent escrow agent which would be used to fund Operating Deficits incurred during the three-year guaranty period specified in the Original Agreement"; that the "Operating General Partner has requested that the Original Agreement be

---

[8]  The Amended Operating Deficit Agreement provides in relevant part:

2.1     The Operating General Partner covenants to lend to the Partnership any amounts required to fund Operating Deficits incurred by the Partnership during the five-year period commencing with the date hereof (the "Funding Period").

modified to reduce the amount of Investor's capital contribution to be withheld and have such amount deposited with the permanent lender for the Apartment Complex to satisfy the lender's requirement for a debt service reserve deposit"; and that "Investor and the Administrative General Partner are willing to modify the Original Agreement as requested by the Operating General Partner provided the term of such guarantee increases."

According to NCTC, these recitations correctly describe the situation that arose as a result of the Partnership's lack of funds to cover the closing of the Permanent Loan.[9] In NCTC's view, these shortfalls at closing were the responsibility of the Operating General Partner because they were development deficits, as those were defined in the Development Services Agreement. Because they were unable to pay these development deficits themselves, however, JNP and Texas Colorado asked the Fund to make the Escrow Deposit funds available to them to cover the costs associated with closing and the $290,000 debt service reserve deposit requested by the permanent lender.[10] Release of the Escrow Deposit to JNP and Texas Colorado not only ensured that the

_____

[9] While JNP and Texas Colorado take issue with NCTC's assertion that the Partnership lacked sufficient funds at the time of closing, testimony at trial established that, but for the release of the $400,000, the Partnership would not have been able to close the loan.

[10] Jeffrey Sussman of NCTC testified as follows:

Q.  There was some testimony from Mr. Lavery about the dire need not to allow this $400,000 to be held back. Do you agree with this characterization by Mr. Lavery?

A.  I think what he's referring to is that if we didn't release this extra $400,000 that there were certain fees and expenses along with the loan, as well as perhaps the lender's reserve which the Operating General Partners would be obligated to come out of their own pockets to pay under their guarantees they made in connection with the fees agreements back in May 1998. And they didn't want to have to come out-of-pocket. They asked that we use the

Partnership would have sufficient cash to close the permanent loan, but it also meant that the Partnership would be able to pay $250,000 of the outstanding Development Fee owed to JNP and Texas Colorado, as contemplated by the Development Services Agreement.

NCTC agreed to release the Escrow Deposit and waive the $400,000 Operating Deficit Reserve requirement on the condition that JNP and Texas Colorado extend their obligation to fund Operating Deficits for an additional two years.[11] NCTC stresses that this amendment was a "bargained for, arms length, quid pro quo agreement," noting that, while it stood to benefit from JNP and Texas Colorado's extension of its guaranty, "such guaranty was now unsecured because [NCTC] waived the $400,000 Operating Deficit Reserve." The agreement was memorialized by letter dated October 31, 2000—the date of the closing of the Permanent Loan—although the Operating Deficit Agreement was not formally signed by all parties until January 10, 2001.

Several years later, in November and December 2004, the Henna Partnership failed to pay its monthly mortgage payments.[12] After the lender notified the Partnership that it would accelerate the loan in response, the Fund paid all of the shortfalls in order to cure the defaults, prevent foreclosure proceedings, and prevent the loan's acceleration. NCTC took the position that

---

money that we were going to set aside to pay these fees and other things associated with the loan so they didn't have to do it. I believe that's what he's referring to. At that time the loan couldn't have closed without releasing the reserves.

[11] In addition, the Fund made an additional $133,000 loan to the Partnership, thus agreeing to provide a total of $1,004,000 upon the closing of the Permanent Loan, rather than the $471,050 it was originally obligated to pay.

[12] It is undisputed that the Henna Partnership again failed to pay its monthly mortgage payments in full in November 2005, December 2005, and January 2006.

these shortfalls were Operating Deficits because they arose during the five-year Funding Period, as that period was redefined under the Amended Operating Deficit Agreement. Accordingly, they exercised their right to remove the Operating General Partner on the basis that JNP and Texas Colorado's actions constituted a major default under the Partnership Agreement.

In response, JNP and Texas Colorado brought suit against NCTC. Their principal theory was that NCTC had unlawfully "extorted" from them the promise to cover operating deficits during the two-year extension of the Funding Period. They asserted that, at the time of the closing of the Permanent Loan, they had asked the Fund to "move $290,000 of the $400,000.00 capital contribution to a reserve account controlled by the lender," which NCTC refused to do "unless and until" JNP and Texas Colorado extended their obligations under the Operating Deficit Agreement. By JNP and Texas Colorado's account, the parties "had to close on the Permanent Loan or risk the event of default" and the loss of millions of dollars of federal tax credits, and thus NCTC took advantage of their economic necessity and coerced them into signed the Amended Operating Deficit Agreement.

In their suit, JNP and Texas Colorado alleged that NCTC breached the partnership agreements by "failing to send proper notice, failing to foreclose, failing to conduct a commercially reasonable foreclosure sale, [and] relying upon an invalid agreement to support their action to remove" JNP and Texas Colorado as Operating General Partner. They also brought causes of action for setoff, quantum meruit, and breach of fiduciary duty. In addition, JNP and Texas Colorado sought damages in the form of recovery of the Development Fee, as well as declarations that (1) JNP and Texas Colorado were entitled to the fair market value of their general partnership interest in the

11

Henna Partnership; (2) any advances made by NCTC should be considered a voluntary loan to the Henna Partnership; (3) NCTC is not entitled to setoff for such advances; and (4) JNP and Texas Colorado were wrongfully terminated as Operating General Partner. NCTC answered, raised several affirmative defenses, counterclaimed for breach of contract, and sought declaratory relief that JNP and Texas Colorado's actions constituted a material default of the partnership agreements, entitling NCTC to remove them as Operating General Partner.

At trial, NCTC moved for a directed verdict on all of its claims and defenses. The trial court granted the motion in part, finding that as a matter of law JNP and Texas Colorado had breached the Amended Operating Deficit Agreement "by fail[ing] to make various mortgage payments and other allegations," but determined that the question of whether this breach should be excused "is subject to a jury question." The trial court also granted NCTC's motion for directed verdict regarding JNP and Texas Colorado's claims of quantum meruit and breach of fiduciary duty "as a cause of action itself."

Over NCTC's objection, the jury was submitted the following question concerning whether JNP and Texas Colorado's breach of the Amended Operating Deficit Agreement was excused:

> Did Defendants exert wrongful economic coercion that caused Plaintiffs to sign the Amended Operating Deficit Agreement contrary to their free will and interest?
>
> In considering whether Defendants exerted wrongful economic coercion, you may consider the fiduciary duty that imposes upon all partners the obligation of loyalty to the partnership and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the partnership.

12

Conditioned on an affirmative finding to Question 1, the jury was then asked:

Did Plaintiffs waive any claim that they were coerced into signing the Amended Operating Deficit Agreement?

The jury answered "yes" to Question 1, finding that NCTC exerted wrongful economic coercion, and "no" to Question 2 regarding waiver. JNP and Texas Colorado moved for judgment on the verdict, and NCTC responded with a motion for judgment notwithstanding the verdict or, alternatively, to disregard the jury findings. After a hearing, the trial court rendered judgment that, based on the jury's verdict, NCTC had breached the Investment Agreement and the Partnership Agreement by removing JNP and Texas Colorado from the Henna Partnership. The trial court ordered that JNP and Texas Colorado be restored as Operating General Partner; that NCTC turn over all partnership records, financial statements, and other partnership documents and property to the Operating General Partner; and that JNP and Texas Colorado be awarded attorney's fees. NCTC filed a motion for new trial and a motion to modify, correct, or reform the judgment to reflect the proper allocation of attorney's fees, which the trial court denied.

NCTC brings four issues on appeal. In its first issue, NCTC argues that there is no evidence, or legally insufficient evidence, that the Amended Operating Deficit Agreement was executed under duress, and thus the trial court erred in denying its motion for directed verdict, submitting the question to the jury, and denying NCTC's motion to disregard the jury findings. In its second issue, NCTC argues that JNP and Texas Colorado waived their affirmative defense of duress by acting under the contract that was purportedly executed under duress and failing to raise any complaint about their financial obligations for nearly four years. By its third issue, NCTC argues

13

that even if the jury's finding on the duress question is upheld, the trial court erred in determining that NCTC breached the governing agreements by removing JNP and Texas Colorado as Operating General Partner. Finally, NCTC complains in its fourth issue that the trial court erred in declaring that JNP and Texas Colorado were the prevailing parties and awarding them attorney's fees.

## DISCUSSION

### *Duress*

In its first issue, NCTC argues that the duress question was improperly submitted to the jury, that the instruction itself was legally incorrect, and that the jury's finding was erroneously upheld by the trial court. "Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise." *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). A trial court may disregard a jury's verdict and render judgment notwithstanding the verdict if no evidence supports the jury's findings or if a directed verdict would have been proper. *See Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003). Accordingly, we review directed verdicts and judgments notwithstanding the verdict under the same standard used for reviewing legal sufficiency, viewing the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 823, 827.

It is well established that, as a matter of law, there can be no duress unless: (1) there is a threat to do something that the party threatening has no legal right to do; (2) there is some illegal exaction or some fraud or deception; and (3) the restraint is imminent and such as to destroy free agency without present means of protection. *Deer Creek Ltd. v. North Am. Mortgage Co.*, 792

14

S.W.2d 198, 200 (Tex. App.—Dallas 1990, no writ); *Tower Contracting Co. v. Burden Bros., Inc.*, 482 S.W.2d 330, 335 (Tex. Civ. App.—Dallas 1972, writ ref'd n.r.e.). "[I]n all its forms (whether called duress, implied duress, business compulsion, economic duress or duress of property)," a claim of duress requires a showing of "improper or unlawful conduct or threat of improper or unlawful conduct that is intended to and does interfere with another person's exercise of free will and judgment." *Dallas County Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 878-79 (Tex. 2005). "Threatening to do that which a party has a legal right to do cannot form the basis of a claim of duress by business compulsion." *Sanders v. Republic Nat'l Bank*, 389 S.W.2d 551, 554 (Tex. Civ. App.—Tyler 1965, no writ); *see In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 574 (Tex. 1999) (defining duress as "a threat to do some act which the threatening party has no legal right to do"); *Windham v. Alexander, Weston & Poehner, P.C.*, 887 S.W.2d 182, 185 (Tex. App.—Texarkana 1994, writ denied). Moreover,

> [a] charge of economic duress or business compulsion must be based on the acts or conduct of the opposite party and not merely on the necessities of the purported victim, or on his fear of what a third person might do, and the mere fact that a person enters into a contract with reluctance, or as a result of the pressure of business circumstances, financial embarrassment, or economic necessity, does not, of itself, constitute business compulsion or economic duress invalidating the contract.

*First Tex. Sav. Ass'n v. Dicker Ctr.*, 631 S.W.2d 179, 186 (Tex. App.—Tyler 1982, no writ). This follows from the proposition that the stress of business conditions will not constitute duress unless the defendant was responsible for that condition. *See W.R. Grimshaw Co. v. Nevil C. Withrow Co.*, 248 F.2d 895, 904 (8th Cir. 1957); *Fruhauf Sw. Garment Co. v. United States*, 111 F. Supp. 945, 951 (Ct. Cl. 1953); *see also Wright v. Sydow*, 173 S.W.3d 534, 544 (Tex. App.—Houston [14th Dist.]

15

2004, pet. denied) ("The victim's plight alone will not suffice; it must be coupled with the bad acts of the transgressor.").

In support of the jury's finding that they acted under duress in agreeing to amend the Operating Deficit Agreement, JNP and Texas Colorado rely on the following four actions by NCTC, as set forth in JNP and Texas Colorado's briefs:

(1)     Appellants refused to release a portion of their required investment (over one million dollars) that was due (under the partners' agreements) upon the funding of the Permanent Loan; Appellants refused to release these funds (which could have been used to cover the permanent lender reserve) until after the funding of the Permanent Loan;

(2)     Appellants demanded that they be paid $250,000 (for another deal) on the closing of the Permanent Loan in violation of the partners' agreements; the payment of these funds created a deficit for the partnership and these funds could also have been used by the partnership to pay the permanent lender reserve;

(3)     Appellants refused to place the current reserve (of $400,000) for the construction portion of the project with an independent escrow agent chosen by Appellees in violation of the partners' agreement; with control of the $400,000 reserve, Appellants refused to release the funds to the control of the permanent lender or the partnership;

(4)     Appellants extorted their partners by demanding on the eve of the closing of the Permanent Loan and the eve of the Partnership losing its tax credits that their fellow partners extend their guarantee for an additional two years.

*(1) Refusal to Release Final Capital Contribution*

At oral argument before this Court, JNP and Texas Colorado asserted that they were abandoning their first argument—that NCTC acted unlawfully by refusing to release the final capital

16

contribution until after the funding of the Permanent Loan.[13] Nonetheless, because they raised the argument in their opening brief and repeat it in their post-submission briefing to this Court, we will briefly address it.

The Partnership Agreement states that the Fund was obligated to make its final installment payment of $1,096,097—subject to further adjustment—"upon the later to occur of" several conditions, including "funding of the Permanent Loan" and "the attainment of Rental Achievement." By definition, "Rental Achievement" could not take place until funding of the Permanent Loan had been "fulfilled." Therefore, it is incorrect that the governing agreements permitted the parties to apply the Fund's final capital contribution towards an obligation—the permanent lender's reserve requirement—that needed to have been met *prior to* the fulfillment of a condition precedent to funding the Permanent Loan. Put differently, the Partnership had to cover the permanent lender's $290,000 debt service reserve deposit in order to close the Permanent Loan, while the Fund was not obligated to release its final capital contribution until the Permanent Loan had closed, which was itself a condition precedent to "attaining Rental Achievement." Thus, not only was the Fund *permitted* to withhold its final capital contribution rather than apply some of the funds towards the lender's reserve deposit, it was *required* to do so under the Partnership Agreement. Because the Fund acted in accordance with the governing agreements in releasing its final capital contribution "upon funding of the Permanent Loan," its actions do not constitute "improper or

---

[13] We note that neither JNP nor Texas Colorado raise an issue on cross-appeal complaining of error in the trial court's "rejection" of this theory of duress.

17

unlawful conduct or threat of improper or unlawful conduct" sufficient to support a claim of duress.
*See Bolton*, 185 S.W.3d at 878-79.

## *(2) Demand of $250,000 From JNP and Texas Colorado*

JNP and Texas Colorado next assert that NCTC improperly demanded $250,000 for "a totally different business deal," which caused the Partnership to incur a deficit and deprived it of funds that it could have used for the lender's reserve deposit. In support, JNP and Texas Colorado point to testimony from Jeffrey Sussman of NCTC and Michael Lavery of Texas Colorado. On cross-examination, Sussman was asked about the deposit of the final capital contribution made by the Fund and the release of the $400,000 Escrow Deposit:

> Q.  It looks like here that [NCTC] got $250,000?
>
> A.  That was wired to [NCTC], yes.
>
> Q.  So out of this 400,000 and in the loan proceeds, $250,000 went to [NCTC]?
>
> A.  Well, we actually—the Fund actually deposited about a million dollars into this escrow account in conjunction with the funding of the permanent loan. The $250,000 was payment of the development fee to JNP Properties and Texas Colorado.

Sussman further testified:

> A.  [NCTC] ended up getting the money because Texas Colorado had assigned a portion to them of repayment of a prior debt.
>
> . . . .
>
> Q.  Do you know if they actually got a check or are you just keeping the money and said, you owe us this?

18

A.     Oh, no, no. They actually did get the money. They used it to repay [NCTC] for the preexisting obligation.

Sussman was then cross-examined regarding the "unrelated business deal" with an entity called Heritage:

Q.     Okay. Now, isn't it—Heritage had an interest in the developer fee, right?

A.     I am not sure what the arrangement between Texas Colorado and Heritage was exactly. I know there's been talk they had some interest and so forth. I am not sure what these arrangements were exactly.

Q.     But you also know that Heritage had a debt to [NCTC]?

A.     Yes, that's correct.

. . . .

Q.     Was there some entity that had the name—the words Heritage in it that had [NCTC] or [NCTC] entity?

A.     Yes.

Q.     And somehow or another the money out of the Henna Townhomes deal closing went to discharge a debt that this Heritage entity had to the [NCTC] entity?

A.     Yes, that's generally correct.

Q.     But it wasn't a Texas Colorado debt, was it?

A.     I am not sure what the arrangement was. There was an arrangement between Texas Colorado and Heritage that Texas Colorado would use the $250,000 development fee to repay [NCTC]. There is some arrangement that I am aware of.

Q.     But what I am saying is Texas Colorado had nothing to do with the debt that Heritage had to [NCTC]?

19

A.     I think Texas Colorado—it's a little bit—sir, there was a debt to Heritage and Heritage had a debt to [NCTC]. And so the money just went right around that's how I think it worked.

Q.     But what I'm saying, sir, Texas Colorado had nothing to do with the debt that Heritage had to [NCTC]?

A.     No, I think it did have something to do with it.

There was no further testimony from Sussman on this issue. Lavery subsequently testified regarding this $250,000, responding to a question about how JNP and Texas Colorado would have had the money to close the Permanent Loan if NCTC had not released the $400,000 Escrow Deposit. Lavery stated:

> I'll tell you exactly where we would have gotten the money, okay? If you look at the closing statements from that perm loan closing, the first thing you'll notice, there's a $250,000 payment to [NCTC], okay? [NCTC] was taking care of their own interests and not the partner interest at closing, okay, and they could have easily deferred that 250,000 but they didn't. So they—you know, they—they put the hammer on us to pay the 250 at that point in time the day—the very day that we go to close our permanent loan. So that's where 250,000 of it could have come from, okay?

According to JNP and Texas Colorado, this action "was truly extortion" because it showed that NCTC demanded payment of a preexisting obligation when such funds could have later been used by the Partnership in order to satisfy the lender's debt service reserve requirement. As Lavery testified, NCTC "could have easily deferred" its request for repayment, but chose not to, which presumably contributed to JNP and Texas Colorado's subsequent inability to fund the reserve requirement but for the Fund's release of the $400,000 Escrow Deposit.

20

As a preliminary matter, we note that the evidence is far from clear as to whether the $250,000 payment was made directly to NCTC in discharge of a debt owed by Texas Colorado, or whether, as JNP and Texas Colorado seem to suggest, the funds were transmitted by Texas Colorado to the Heritage entity and then to NCTC at NCTC's direction in order to satisfy a debt owed by Heritage. Regardless of the precise nature of the Heritage entity's involvement, however, JNP and Texas Colorado have not shown that NCTC's actions were improper. JNP and Texas Colorado do not dispute NCTC's claim that Texas Colorado owed a preexisting debt to NCTC, nor do they argue that NCTC was not legally entitled to request repayment of that debt. The fact that the transaction also involved another business entity does not establish that the $250,000 payment was made to NCTC for a "totally different business deal"—particularly in light of Sussman's testimony to the contrary that these debts were related. But even more importantly, the record fails to show that NCTC had no legitimate right to demand repayment of the debt owed by Texas Colorado. *See Eggleston v. Humble Pipe Line Co.*, 482 S.W.2d 909, 916 (Tex. Civ. App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.) (holding that "threat to do that which an individual has a legal right to do will not form duress"). On the contrary, the record contains unrebutted evidence that Texas Colorado had assigned $250,000 of its portion of the Development Fee to NCTC under a Warranty Assignment executed in June 1998.[14]

Further, there is no indication that NCTC's demand of the $250,000 payment was a threat "of such character as to destroy the free agency of the party to whom it is directed." *See First*

---

[14] As NCTC urges in its post-submission letter brief, the $250,000 warranty assignment "was therefore agreed to and known to Appellees two years prior to the closing of the permanent loan and alleged duress."

*Tex. Sav. Ass'n*, 631 S.W.2d at 184 (citing *Dale v. Simon*, 267 S.W. 467, 470 (Tex. Comm'n App. 1924, judgm't adopted) (holding that threat must overcome will of victim and cause him to do that which he would not otherwise do and which he was not legally bound to do)). JNP and Texas Colorado presented no evidence that if Texas Colorado refused to pay NCTC the $250,000 at that time, NCTC was threatening "to do an act which would cause injury to their business or property interests," *see Dale*, 267 S.W.2d at 470, or that its agreement to pay was anything but voluntary. Lavery's testimony indicates only that it would have been more convenient to repay the debt at a later time, instead using the $250,000 for the lender's debt service reserve requirement. Having failed to show that their free agency was destroyed as a result of an imminent threat to their business interests that coerced them into paying NCTC the $250,000, JNP and Texas Colorado cannot later cite NCTC's demand for repayment as evidence of wrongful conduct to sustain a claim of duress. *See Sanders*, 389 S.W.2d at 554 (holding that there was no evidence of duress when record indicated that rent payment was made voluntarily and provisions of governing contract would permit other party to assert its claim to demand payment).

### *(3) Refusal to Release Escrow Deposit*

The third instance of allegedly unlawful conduct relied on by JNP and Texas Colorado is NCTC's refusal "to release the Construction Reserve[15] to the Permanent Lender or Appellees" in violation of section 4.1 of the Original Operating Deficit Agreement. Characterizing

---

[15] As discussed previously, the Original Operating Deficit Agreement identifies this as the "Operating Deficit Reserve," and the funds contained therein as the "Escrow Deposit." There is no mention in this Agreement of a "Construction Reserve."

this refusal as a breach of the Original Operating Deficit Agreement, JNP and Texas Colorado assert that, had NCTC "released the reserve fund to an independent escrow agent—as they were required to do—then the partnership would have had a reserve account sufficient to satisfy the permanent lender and such action would have been in accordance with the parties' agreements." We disagree with JNP and Texas Colorado's interpretation for several reasons.

First, the Original Operating Deficit Agreement plainly states that as security for the Operating General Partner's obligations to fund operating deficits, the Fund (as "Investor")

> shall withhold $400,000 of the [final installment] portion of the Capital Contribution described in Paragraph 2.1(e) of the Investment Agreement and deposit such funds (the "Escrow Deposit") into an interest bearing reserve account with an independent escrow agent selected by the Operating General Partner and reasonably acceptable to Investor. . . .

JNP and Texas Colorado read this provision to mean that the Fund breached the agreement by failing to place the $400,000 Escrow Deposit with the independent escrow agent before the Permanent Loan closed. The $400,000, however, was to be "withheld" from the Fund's final capital contribution, which was due "upon" closing, not beforehand. For the same reason that the final capital contribution itself could not be applied towards the lender's debt service reserve deposit, any monies intended to be withheld from that contribution likewise were not required to be used toward this pre-closing obligation.

Second, JNP and Texas Colorado are incorrect that they were entitled to apply the Escrow Deposit funds toward the lender's debt service reserve deposit. The Original Operating Deficit Agreement states that the funds in the Operating Deficit Reserve Account, *i.e.*, the Escrow

23

Deposit, "shall be used to pay Operating Deficits incurred during the Funding Period," which was defined as the period "commencing with the date Rental Achievement is attained." Given that the Funding Period did not begin until after the Permanent Loan closed, the lender's debt service reserve deposit was not, by definition, an Operating Deficit incurred during the Funding Period to which the Escrow Deposit funds could be applied.

For this reason, JNP and Texas Colorado are incorrect that NCTC's failure to place the Escrow Deposit with an independent escrow agent was wrongful and forced them to "have to put up two reserves for the same purpose." The funds in the Operating Deficit Reserve Account were specifically designated for paying operating deficits that arose during the Funding Period, while the permanent lender's debt service reserve deposit was a distinct obligation that arose prior to commencement of the Funding Period.

In their briefs, JNP and Texas Colorado make much of the fact that the Fund never released the $400,000 Escrow Deposit to an independent escrow agent, which they maintain would have allowed them to access the funds in order to satisfy the permanent lender's reserve requirement. This supposition, however, is inconsistent with the provisions of the Original Operating Deficit Agreement controlling disbursal of the Escrow Deposit, which state:

> The Operating General Partner shall notify Investor of any Operating Deficit and shall include with such notice reasonably detailed information about current Partnership receipts and operating obligations. *Provided Investor is reasonably satisfied with such information*, Investor shall release to the Operating General Partner (or, *at Investor's election*, directly to the creditor(s) of the Partnership or jointly to the Operating General Partner and such creditor(s)) the amount of such Operating Deficit.

(Emphases added.) Thus, JNP and Texas Colorado's position ignores the fact that the decision to release any Escrow Deposit funds was a matter within the Fund's discretion; it was not automatic or dependent solely upon the Partnership's need for such funds. In light of this fact, JNP and Texas Colorado have failed to show how the Fund's mere failure to place the funds with an independent escrow agent was a wrongful act that was intended to and actually did interfere with their exercise of free will and judgment, *see Bolton*, 185 S.W.3d at 878-79, and thus failed to raise evidence that they signed the Amended Operating Deficit Agreement under duress.

### *(4) Demand to Extend JNP and Texas Colorado's Funding Period Obligation*

The final instance of conduct that JNP and Texas Colorado assert was wrongful was NCTC's demand, "on the eve of the closing of the Permanent Loan and the eve of the Partnership losing its tax credits that their fellow partners extend their guarantee for an additional two years." Essentially, JNP and Texas Colorado argue that NCTC exploited their financial difficulties by making improper demand and employing extortive measures to force JNP and Texas Colorado to sign the Amended Operating Deficit Agreement.

As explained previously, there can be no duress resulting from a threat to do that which a party has a legal right to do; rather, "[t]he vice arises only when he employs extortive measures, or when, lacking good faith, he makes improper demands." *Sanders*, 389 S.W.2d at 554-55. We have already reviewed and rejected JNP and Texas Colorado's assertion that NCTC was required to release certain funds prior to the closing of the Permanent Loan; therefore, JNP and Texas Colorado cannot rely on this refusal as a basis for asserting that NCTC extorted their agreement to extend their obligation to pay Operating Deficits. Furthermore, JNP and Texas

25

Colorado raised no evidence of any improper demand or threat made by NCTC that coerced them into signing the agreement. The alleged possibility that the Partnership would lose its tax credits if JNP and Texas Colorado did not agree to the terms of the Amended Operating Deficit Agreement is a matter "relate[d] to anticipated possible disadvantageous side effects" of such a decision. *See Eggleston*, 482 S.W.2d at 916. Those exigencies themselves "are not coercive devices applied by [NCTC,] but are foreseeable ramifications of a breakdown" by JNP and Texas Colorado in the performance of their own obligations under the governing agreements, *see id.*, upon which a charge of economic duress cannot properly be based, *see First Tex. Sav. Ass'n*, 631 S.W.2d at 186.

We further note that the record contains a number of statements from Lavery and John Paul of JNP that they "felt duress" and that "they had no choice" but to agree to the terms of the Amended Operating Deficit Agreement. Such statements are not evidence of duress. *See id.* at 185 ("The fact that [appellee] announced that he was signing the release under duress does not establish that conclusion without proof of the elements of duress."). Nor is it relevant to the duress inquiry that the Partnership was facing potentially severe economic consequences at the time the Operating Deficit Agreement was amended, as the record is devoid of evidence that NCTC *created* the circumstances under which JNP and Texas Colorado felt obligated to agree to the amendment. *See id.* at 186 (charge of economic duress must be based on acts or conduct of opposite party, not merely on necessities of purported victim); *see also Brown v. Cain Chem., Inc.*, 837 S.W.2d 239, 244 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (duress must derive from acts or conduct of the party accused of duress).

26

We sustain NCTC's first issue and conclude that, as a matter of law, JNP and Texas Colorado produced no evidence of duress.[16] *See Deer Creek Ltd.*, 792 S.W.2d at 200; *see also Windham v. Alexander, Weston & Poehner, P.C.*, 887 S.W.2d 182, 185 (Tex. App.—Texarkana 1994, writ denied) (issue of what constitutes duress is question of law). Therefore, we reverse the judgment of the trial court and hold that NCTC did not breach the partnership agreements by removing JNP and Texas Colorado as Operating General Partner.

### *Attorney's Fees*

In its fourth issue, NCTC complains of the trial court's award of $66,966.93 and $143,280.12 in attorney's fees to JNP and Texas Colorado, respectively, as well as post-judgment interest and additional appellate attorney's fees. Having reversed the trial court's judgment and rendered judgment in favor of NCTC, we remand the issue of attorney's fees to the trial court, consistent with the provisions of the parties' written contracts permitting the award of attorney's fees to the prevailing party.

### CONCLUSION

The evidence is legally insufficient to support JNP and Texas Colorado's claim that it executed the Amended Operating Deficit Agreement under duress, thereby excusing its breach of the partnership agreements. Accordingly, we reverse the judgment of the trial court, render judgment that JNP and Texas Colorado take nothing by their claims against NCTC, and remand the cause to the trial court for further proceedings on the issue of attorney's fees.

---

[16] In light of the foregoing, we need not reach NCTC's second and third issues.

27

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Henson

Reversed and Rendered in part; Reversed and Remanded in part

Filed:   April 30, 2009